# BRIDGES *v.* CALIFORNIA.*

No. 1.   Argued October 18, 21, 1940 (No. 19, 1940 Term).   Reargued October 13, 1941.—Decided December 8, 1941.

---

*Together with No. 3, *Times-Mirror Co. et al.* v. *Superior Court of California in and for the County of Los Angeles,* also on writ of certiorari, 310 U. S. 623, to the Supreme Court of California.   Argued October 21, 1940 (No. 64, 1940 Term); reargued October 13, 14, 1941.

*Mr. Osmond K. Fraenkel,* with whom *Mr. A. L. Wirin* was on the brief, on the reargument for petitioner in No. 1. *Mr. Wirin* on the original brief and argument.

254

*Mr. T. B. Cosgrove,* with whom *Messrs. John N. Cramer* and *F. B. Yoakum, Jr.* were on the brief, for petitioners in No. 3.

*Mr. Allen W. Ashburn,* with whom *Messrs. J. H. O'Con-nor, Wm. B. McKesson,* and *Michael G. Luddy* were on the brief, for respondents.

Mr. Justice Black delivered the opinion of the Court.

These two cases, while growing out of different circumstances and concerning different parties, both relate to the scope of our national constitutional policy safeguarding free speech and a free press. All of the petitioners were adjudged guilty and fined for contempt of court by the Superior Court of Los Angeles County. Their conviction rested upon comments pertaining to pending litigation which were published in newspapers. In the Superior Court, and later in the California Supreme Court, petitioners challenged the state's action as an abridgment, prohibited by the Federal Constitution, of freedom of

speech and of the press; but the Superior Court overruled this contention, and the Supreme Court affirmed.[1] The importance of the constitutional question prompted us to grant certiorari. 309 U. S. 649; 310 U. S. 623.

In brief, the state courts asserted and exercised a power to punish petitioners for publishing their views concerning cases not in all respects finally determined, upon the following chain of reasoning: California is invested with the power and duty to provide an adequate administration of justice; by virtue of this power and duty, it can take appropriate measures for providing fair judicial trials free from coercion or intimidation; included among such appropriate measures is the common law procedure of punishing certain interferences and obstructions through contempt proceedings; this particular measure, devolving upon the courts of California by reason of their creation as courts, includes the power to punish for publications made outside the court room if they tend to interfere with the fair and orderly administration of justice in a pending case; the trial court having found that the publications had such a tendency, and there being substantial evidence to support the finding, the punishments here imposed were an appropriate exercise of the state's power; in so far as these punishments constitute a restriction on liberty of expression, the public interest in that liberty was properly subordinated to the public interest in judicial impartiality and decorum.[2]

---

[1] Bridges v. Superior Court, 14 Cal. 2d 464, 94 P. 2d 983; Times-Mirror Co. v. Superior Court, 15 Cal. 2d 99, 98 P. 2d 1029. In the Times-Mirror case, the affidavits of complaint contained seven counts, each based upon the publication of a different editorial. The Superior Court for Los Angeles County sustained a demurrer to two of the counts, and of the five remaining counts on which conviction rested, the California Supreme Court affirmed as to three, reversed as to two.

[2] See Times-Mirror Co. v. Superior Court, supra, 118, where the following is quoted with approval: "Liberty of the press is subordinate to the independence of the judiciary. . . ."

If the inference of conflict raised by the last clause be correct, the issue before us is of the very gravest moment. For free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them. But even if such a conflict is not actually raised by the question before us, we are still confronted with the delicate problems entailed in passing upon the deliberations of the highest court of a state. This is not, however, solely an issue between state and nation, as it would be if we were called upon to mediate in one of those troublous situations where each claims to be the repository of a particular sovereign power. To be sure, the exercise of power here in question was by a state judge. But in deciding whether or not the sweeping constitutional mandate against any law "abridging the freedom of speech or of the press" forbids it, we are necessarily measuring a power of all American courts, both state and federal, including this one.

I

It is to be noted at once that we have no direction by the legislature of California that publications outside the court room which comment upon a pending case in a specified manner should be punishable. As we said in *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308, such a "declaration of the State's policy would weigh heavily in any challenge of the law as infringing constitutional limitations." But as we also said there, the problem is different where "the judgment is based on a common law concept of the most general and undefined nature." *Id.* 308. Cf. *Herndon* v. *Lowry,* 301 U. S. 242, 261–264. For here the legislature of California has not appraised a particular kind of situation and found a specific danger [3] sufficiently

---

[3] Indeed, the only evidence we have of the California legislature's appraisal indicates approval of a policy directly contrary to that here

imminent to justify a restriction on a particular kind of utterance. The judgments below, therefore, do not come to us encased in the armor wrought by prior legislative deliberation. Under such circumstances, this Court has said that "it must necessarily be found, as an original question," that the specified publications involved created "such likelihood of bringing about the substantive evil as to deprive [them] of the constitutional protection." *Gitlow* v. *New York,* 268 U. S. 652, 671.

How much "likelihood" is another question, "a question of proximity and degree" [4] that cannot be completely captured in a formula. In *Schenck* v. *United States,* however, this Court said that there must be a determination of whether or not "the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils." We recognize that this statement, however helpful, does not comprehend the whole problem. As Mr. Justice Brandeis said in his concurring opinion in *Whitney* v. *California,* 274 U. S. 357, 374: "This Court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present."

followed by the California courts. For § 1209, subsection 13, of the California Code of Civil Procedure (1937 ed.) provides: ". . . no speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings." The California Supreme Court's decision that the statute is invalid under the California constitution is an authoritative determination of that point. But the inferences as to the legislature's appraisal of the danger arise from the enactment, and are therefore unchanged by the subsequent judicial treatment of the statute.

[4] *Schenck* v. *United States,* 249 U. S. 47, 52.

Nevertheless, the "clear and present danger" language [5] of the *Schenck* case has afforded practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue. It has been utilized by either a majority or minority of this Court in passing upon the constitutionality of convictions under espionage acts, *Schenck* v. *United States, supra; Abrams* v. *United States,* 250 U. S. 616; under a criminal syndicalism act, *Whitney* v. *California, supra;* under an "anti-insurrection" act, *Herndon* v. *Lowry, supra;* and for breach of the peace at common law, *Cantwell* v. *Connecticut, supra.* And very recently we have also suggested that "clear and present danger" is an appropriate guide in determining the constitutionality of restrictions upon expression where the substantive evil sought to be prevented by the restriction is "destruction of life or property, or invasion of the right of privacy." *Thornhill* v. *Alabama,* 310 U. S. 88, 105.

Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be "substantial," Brandeis, J., concurring in *Whitney* v. *California, supra,* 374; it must be "serious," *id.* 376. And

---

[5] Restatement of the phrase "clear and present danger" in other terms has been infrequent. Compare, however: ". . . the test to be applied . . . *is not the remote or possible effect."* Brandeis, J., dissenting in *Schaefer* v. *United States,* 251 U. S. 466, 486. ". . . we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, *unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country."* Holmes, J., dissenting in *Abrams* v. *United States,* 250 U. S. 616, 630; "To justify suppression of free speech *there must be reasonable ground to fear that serious evil will result* if free speech is practiced. *There must be reasonable ground to believe that the danger apprehended is imminent."* Brandeis, J., concurring in *Whitney* v. *California,* 274 U. S. 357, 376. The italics are ours.

even the expression of "legislative preferences or beliefs" cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. *Schneider v. State*, 308 U. S. 147, 161.

What finally emerges from the "clear and present danger" cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment [6] does not speak equivocally. It prohibits any law "abridging the freedom of speech, or of the press." It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.

## II

Before analyzing the punished utterances and the circumstances surrounding their publication, we must consider an argument which, if valid, would destroy the relevance of the foregoing discussion to this case. In brief, this argument is that the publications here in question belong to a special category marked off by history,—a category to which the criteria of constitutional immunity from punishment used where other types of utterances are concerned are not applicable. For, the argument runs, the power of judges to punish by contempt out-of-court publications tending to obstruct the orderly and fair administration of justice in a pending case was deeply

---

[6] "The freedom of speech and of the press secured by the First Amendment against abridgment by the United States is similarly secured to all persons by the Fourteenth against abridgment by a state." *Schneider v. State*, 308 U. S. 147, 160.

rooted in English common law at the time the Constitution was adopted. That this historical contention is dubious has been persuasively argued elsewhere. Fox, *Contempt of Court, passim, e. g.*, 207. See also Stansbury, *Trial of James H. Peck*, 430. In any event it need not detain us, for to assume that English common law in this field became ours is to deny the generally accepted historical belief that "one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press."[7] Schofield, *Freedom of the Press in the United States*, 9 Publications Amer. Sociol. Soc., 67, 76.

More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: "Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution." 1 Annals of Congress 1789–1790, 434. And Madison elsewhere wrote that "the state of the press . . . under the common law, cannot . . . be the standard of its freedom in the United States." VI Writings of James Madison 1790–1802, 387.

---

[7] Compare James Buchanan, quoted in Stansbury, Trial of James H. Peck, 434: "At the Revolution we separated ourselves from the mother country, and we have established a republican form of government, securing to the citizens of this country other and greater personal rights, than those enjoyed under the British monarchy."

There are no contrary implications in any part of the history of the period in which the First Amendment was framed and adopted. No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. It cannot be denied, for example, that the religious test oath [8] or the restrictions upon assembly [9] then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing. And since the same unequivocal language is used with respect to freedom of the press, it signifies a similar enlargement of that concept as well.[10] Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society.

---

[8] 16 Geo. II, c. 30. This was not repealed until 1828. 9 Geo. IV, c. 17.

[9] 1 Geo. I, stat. 2, c. 5. Cf. also 36 Geo. III, c. 8, and discussion in Buckle, History of Civilization in England, Vol. I, 351.

[10] Compare VI Writings of James Madison, 1790–1802, 389: "To these observations one fact will be added, which demonstrates that the common law cannot be admitted as the *universal* expositor of American terms, . . . The freedom of conscience and of religion are found in the same instruments which assert the freedom of the press. It will never be admitted that the meaning of the former, in the common law of England, is to limit their meaning in the United States." See also *Near* v. *Minnesota*, 283 U. S. 697, 716–717; *Thornhill* v. *Alabama*, *supra*, 310 U. S. 102.

The implications of subsequent American history confirm such a construction of the First Amendment. To be sure, it occurred no more to the people who lived in the decades following Ratification than it would to us now that the power of courts to protect themselves from disturbances and disorder in the court room by use of contempt proceedings could seriously be challenged as conflicting with constitutionally secured guarantees of liberty. In both state and federal courts, this power has been universally recognized. See *Anderson* v. *Dunn,* 6 Wheat. 204, 227. But attempts to expand it in the post-Ratification years evoked popular reactions that bespeak a feeling of jealous solicitude for freedom of the press. In Pennsylvania and New York, for example, heated controversies arose over alleged abuses in the exercise of the contempt power, which in both places culminated in legislation practically [11] forbidding summary punishment for publications. See Nelles and King, *Contempt by Publication,* 28 Col. L. Rev. 401, 409–422.

In the federal courts, there was the celebrated case of Judge Peck, recently referred to by this Court in *Nye* v. *United States,* 313 U. S. 33, 45. The impeachment proceedings against him, it should be noted, and the strong feelings they engendered, were set in motion by his summary punishment of a lawyer for publishing comment on a case which was on appeal at the time of publication

---

[11] The New York statute specifically made "the publication of a false, or grossly inaccurate report" of court proceedings punishable by contempt proceedings, however. New York Rev. Stat. 1829, Part III, c. III, tit. 2, art. 1, § 10 (6). The Pennsylvania statute contained no such proviso. It explicitly stated that "all publications out of court . . . concerning any cause pending before any court of this commonwealth, shall not be construed into a contempt of the said court, so as to render the author, printer, publisher, or either of them, liable to attachment and summary punishment for the same." Pa. Acts 1808–1809, c. 78, p. 146.

and which raised the identical issue of several other cases then pending before him. Here again legislation was the outcome, Congress proclaiming in a statute expressly captioned "An Act *declaratory* of the law concerning contempts of court," [12] that the power of federal courts to inflict summary punishment for contempt "shall not be construed to extend to any cases except the misbehaviour of . . . persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice . . ." When recently called upon to interpret this statute, we overruled the earlier decision of this Court in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, in the belief that it improperly enlarged the stated area of summary punishment. *Nye* v. *United States, supra.* Here, as in the *Nye* case, we need not determine whether the statute was intended to demarcate the full power permissible under the Constitution to punish by contempt proceedings. But we do find in the enactment viewed in its historical context, a respect for the prohibitions of the First Amendment, not as mere guides to the formulation of policy, but as commands the breach of which cannot be tolerated.

We are aware that although some states have by statute or decision expressly repudiated the power of judges to punish publications as contempts on a finding of mere tendency to interfere with the orderly administration of justice in a pending case, other states have sanctioned the exercise of such a power. (See Nelles and King, *loc. cit. supra,* 536–562, for a collection and discussion of state cases.) But state power in this field was not tested in this Court for more than a century.[13] Not until 1925, with the

---

[12] 4 Stat. 487 (1831).

[13] *Patterson* v. *Colorado,* 205 U. S. 454, the only case before this Court during that period in which a state court's power to punish out-of-court publications by contempt was in issue, cannot be taken

decision in *Gitlow* v. *New York, supra,* 268 U. S. 652, did this Court recognize in the Fourteenth Amendment the application to the states of the same standards of freedom of expression as, under the First Amendment, are applicable to the federal government. And this is the first time since 1925 that we have been called upon to determine the constitutionality of a state's exercise of the contempt power in this kind of situation. Now that such a case is before us, we cannot allow the mere existence of other untested state decisions to destroy the historic constitutional meaning of freedom of speech and of the press.

History affords no support for the contention that the criteria applicable under the Constitution to other types of utterances are not applicable, in contempt proceedings, to out-of-court publications pertaining to a pending case.

### III

We may appropriately begin our discussion of the judgments below by considering how much, as a practical matter, they would affect liberty of expression. It must be recognized that public interest is much more likely to be kindled by a controversial event of the day than by a generalization, however penetrating, of the historian or scientist. Since they punish utterances made during the pendency of a case, the judgments below therefore produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height. Moreover, the ban is likely to fall not only at a crucial time but upon the most important topics of discussion. Here, for example, labor controversies were the topics of some of the publications. Experience shows that the more acute labor controversies are, the more likely

---

as a decision squarely on this point. Cf.: "We leave undecided the question whether there is to be found in the Fourteenth Amendment a prohibition similar to that in the First." *Id.* 462.

it is that in some aspect they will get into court. It is therefore the controversies that command most interest that the decisions below would remove from the arena of public discussion.

No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression. Yet, it would follow as a practical result of the decisions below that anyone who might wish to give public expression to his views on a pending case involving no matter what problem of public interest, just at the time his audience would be most receptive, would be as effectively discouraged as if a deliberate statutory scheme of censorship had been adopted. Indeed, perhaps more so, because under a legislative specification of the particular kinds of expressions prohibited and the circumstances under which the prohibitions are to operate, the speaker or publisher might at least have an authoritative guide to the permissible scope of comment, instead of being compelled to act at the peril that judges might find in the utterance a "reasonable tendency" to obstruct justice in a pending case.

This unfocussed threat is, to be sure, limited in time, terminating as it does upon final disposition of the case. But this does not change its censorial quality. An endless series of moratoria on public discussion, even if each were very short, could hardly be dismissed as an insignificant abridgment of freedom of expression. And to assume that each would be short is to overlook the fact that the "pendency" of a case is frequently a matter of months or even years rather than days or weeks.[14]

---

[14] Compare Nelles and King, *loc. cit. supra*, 549: "While the Sacco-Vanzetti case was in the courts [six years], it was not, we believe, suggested as desirable that public expressions on either side be dealt with as contempts." In public utility rate regulation, to take one of many examples that might be given of a field in which public

For these reasons we are convinced that the judgments below result in a curtailment of expression that cannot be dismissed as insignificant. If they can be justified at all, it must be in terms of some serious substantive evil which they are designed to avert. The substantive evil here sought to be averted has been variously described below.[15] It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste,[16] on all public institutions. And an enforced silence, however limited,

---

interest is strong and public opinion divided, cases commonly remain "pending" for several years. See *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 88–92; *McCart* v. *Indianapolis Water Co.,* 302 U. S. 419, 435.

[15] Cf.: ". . . said telegram . . . had an inherent tendency . . . *to embarrass and influence the actions and decisions of the judge* before whom said action was pending." *Bridges* v. *Superior Court, supra,* 14 Cal. 2d at p. 471; "The published statement was not only *a criticism of the decision of the court* in an action then pending before said court, but was *a threat* that if an attempt was made to enforce the decision, the ports of the entire Pacific Coast would be tied up." *Id.* 488; ". . . the test . . . is whether it had a reasonable tendency *to interfere with the orderly administration of justice* . . ." *Times-Mirror Co.* v. *Superior Court, supra,* 15 Cal. 2d at 103–104; ". . . the editorial [had a] . . . reasonable tendency . . . *to interfere with* the ordinary administration of justice." *Id.* 110. The italics are ours.

[16] Compare the following statements from letters of Thomas Jefferson as set out in Padover, Democracy, 150–151: "I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and mendacious spirit of those who write them. . . . These ordures are rapidly depraving the public taste.

"It is however an evil for which there is no remedy, our liberty depends on the freedom of the press, and that cannot be limited without being lost."

solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word "trial" connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases. We must therefore turn to the particular utterances here in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment.

*The Los Angeles Times Editorials.* The Times-Mirror Company, publisher of the Los Angeles Times, and L. D. Hotchkiss, its managing editor, were cited for contempt for the publication of three editorials. Both found by the trial court to be responsible for one of the editorials, the company and Hotchkiss were each fined $100. The company alone was held responsible for the other two, and was fined $100 more on account of one, and $300 more on account of the other.

The $300 fine presumably marks the most serious offense. The editorial thus distinguished was entitled "Probation for Gorillas?" After vigorously denouncing two members of a labor union who had previously been

found guilty of assaulting nonunion truck drivers, it closes with the observation: "Judge A. A. Scott will make a serious mistake if he grants probation to Matthew Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill." [17] Judge Scott had previously set a day (about a month after the publication) for passing upon the application of Shannon and Holmes for probation and for pronouncing sentence.

The basis for punishing the publication as contempt was by the trial court said to be its "inherent tendency" and by the Supreme Court its "reasonable tendency" to interfere with the orderly administration of justice in an

[17] The whole editorial, published in The Los Angeles Times of May 5, 1938, was as follows:

"Two members of Dave Beck's wrecking crew, entertainment committee, goon squad or gorillas, having been convicted in Superior Court of assaulting nonunion truck drivers, have asked for probation. Presumably they will say they are 'first offenders,' or plead that they were merely indulging a playful exuberance when, with slingshots, they fired steel missiles at men whose only offense was wishing to work for a living without paying tribute to the erstwhile boss of Seattle.

"Sluggers for pay, like murderers for profit, are in a slightly different category from ordinary criminals. Men who commit mayhem for wages are not merely violators of the peace and dignity of the State; they are also conspirators against it. The man who burgles because his children are hungry may have some claim on public sympathy. He whose crime is one of impulse may be entitled to lenity. But he who hires out his muscles for the creation of disorder and in aid of a racket is a deliberate foe of organized society and should be penalized accordingly.

"It will teach no lesson to other thugs to put these men on good behavior for a limited time. Their 'duty' would simply be taken over by others like them. If Beck's thugs, however, are made to realize that they face San Quentin when they are caught, it will tend to make their disreputable occupation unpopular. Judge A. A. Scott will make a serious mistake if he grants probation to Matthew Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill."

action then before a court for consideration. In accordance with what we have said on the "clear and present danger" cases, neither "inherent tendency" nor "reasonable tendency" is enough to justify a restriction of free expression. But even if they were appropriate measures, we should find exaggeration in the use of those phrases to describe the facts here.

From the indications in the record of the position taken by the Los Angeles Times on labor controversies in the past, there could have been little doubt of its attitude toward the probation of Shannon and Holmes. In view of the paper's long-continued militancy in this field, it is inconceivable that any judge in Los Angeles would expect anything but adverse criticism from it in the event probation were granted. Yet such criticism after final disposition of the proceedings would clearly have been privileged. Hence, this editorial, given the most intimidating construction it will bear, did no more than threaten future adverse criticism which was reasonably to be expected anyway in the event of a lenient disposition of the pending case.[18] To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor,—which we cannot accept as a major premise. Cf. Holmes, J., dissenting in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 424.

---

[18] Cf. *Times-Mirror Co.* v. *Superior Court, supra,* 15 Cal. 2d 109–110: "The editorial may not have been intended, but it is capable of being construed, as a notice to the trial judge that no leniency should be extended to the convicted men, and, furthermore, that should the court act contrary to the suggestions contained in the editorial, it might well expect adverse criticism in the columns of The Times." Although the foregoing statement was made with respect to another of the editorials, the opinion of the California Supreme Court later said it was applicable to "Probation for Gorillas?" *Id.* 114–115.

The other two editorials, publication of which was fined below, are set out in the lower margin.[19]   With respect to these two editorials, there is no divergence of conclusions among the members of this Court.   We are all of the opinion that, upon any fair construction, their possible influence on the course of justice can be dismissed as negligible,

[19] The first of these editorials, entitled "Sit-Strikers Convicted," was published in the Los Angeles Times of December 21, 1937, the day after the jury had returned a verdict that the "sit-strikers" in question were guilty, and the day before the trial judge was to hold court for the purpose of pronouncing sentence, hearing motions for a new trial, and passing upon applications for probation.   The editorial follows in its entirety:

"The verdict of a jury finding guilty the twenty-two sit-strikers who led the assault on the Douglas plant last February, will have reverberations up and down the Pacific Coast and in points farther east.

"The verdict means that Los Angeles is still Los Angeles, that the city is aroused to the danger of davebeckism, and that no kind of union terrorism will be permitted here.

"The verdict may have a good deal to do with sending Dave Beck back to Seattle.   For, while the United Automobile Workers have no connection with Beck, their tactics and his are identical in motive; and if Beck can be convinced that this kind of warfare is not permitted in this area he will necessarily abandon his dreams of conquest.

"Already the united farmers and ranchers have given Beck a severe setback.   The Hynes hay market is still free and it has been made plain that interference with milk deliveries to Los Angeles will not be tolerated.

"Dist. Atty. Fitts pledged his best efforts to prevent and punish union terrorism and racketeering in a strong radio address, and followed it up yesterday with a statement congratulating the jury that convicted the sit-downers and the community on one of the 'most far-reaching verdicts in the history of this country.'

"In this he is correct.   It is an important verdict.   For the first time since the present cycle of labor disturbances began, union lawlessness has been treated as exactly what it is, an offense against the public peace punishable like any other crime.

"The seizure of property by a militant minority, which arrogated to itself the right of dictating not only to employers, but to other workers

and that the Constitution compels us to set aside the convictions as unpermissible exercises of the state's power. In view of the foregoing discussion of "Probation for Gorillas?", analysis of these editorials and their setting is deemed unnecessary.

*The Bridges Telegram.* While a motion for a new trial was pending in a case involving a dispute between an

not in sympathy with it, what should be the terms and conditions of working, has proved to be within the control of local peace officers and authorities.

"Nobody ran off to Washington to get this affair handled. It was attended to right here.

"Government may have broken down in other localities; whole States may have yielded to anarchy. But Los Angeles county stands firm; it has officers who can do their duty and courts and juries which can function.

"So long as that is the case, davebeckism cannot and will not get control here; nor johnlewisism either."

The second of these editorials, entitled "The Fall of an Ex-Queen," was published in The Los Angeles Times of April 14, 1938. Here, too, publication took place after a jury had found the subject of the editorial guilty, but before the trial judge had pronounced sentence. The editorial follows in its entirety:

"Politics as we know it is an essentially selfish business, conducted in the main for personal profit of one kind or another. When it is of the boss type, it is apt to be pretty sordid as well. Success in boss-ship, which is a denial of public rights, necessarily implies a kind of moral obliquity if not an actually illegal one.

"So that it is something of a contradiction of sense if not of terms to express regret that the political talents of Mrs. Helen Werner were not directed to other objectives than those which, in the twilight of her active life, have brought her and her husband to disgrace. If they had been, she would not have been in politics at all and probably would never have been heard of in a public way. Her natural flair was purely political; she would have been miscast in any other sphere of activity.

"Mrs. Werner's primary mistake seems to have been in failing to recognize that her political day was past. For years she enjoyed the unique distinction of being the country's only woman boss—and did she enjoy it! In her heyday she had a finger in every political pie and many were the plums she was able to extract therefrom for those

A. F. of L. union and a C. I. O. union of which Bridges was an officer, he either caused to be published or acquiesced in the publication of a telegram which he had sent to the Secretary of Labor. The telegram referred to the judge's decision as "outrageous"; said that attempted enforcement of it would tie up the port of Los Angeles and involve the entire Pacific Coast; and concluded with the announcement that the C. I. O. union, representing some twelve thousand members, did "not intend to allow state courts to override the majority vote of members in choosing its officers and representatives and to override the National Labor Relations Board." [20]

who played ball with her. From small beginnings she utilized every opportunity to extend her influence and to put officeholders and promising political material under obligations to her. She became a power in the backstage councils of city and county affairs and from that place of strategic advantage reached out to pull the strings on State and legislative offices as well.

"Those were the days when Mrs. Werner was 'Queen Helen' and it is only fair to say that to her the power was much more important than the perquisites. When the inevitable turning of the political wheel brought new figures to the front and new bosses to the back, she found her grip slipping and it was hard to take. The several cases which in recent years have brought her before the courts to defend her activities seem all examples of an energetic effort to regain and reassert her onetime influence in high places. That it should ultimately have landed her behind the bars as a convicted bribe-seeker is not illogical. But if there is logic in it, the money meant less to Mrs. Werner than the name of still being a political power, one who could do things with public officials that others could not do. To herself at least she was still Queen Helen."

[20] The portions of the telegram published in newspapers of general circulation in San Francisco and Los Angeles on January 24 and 25, 1938, were as follows:

"This decision is outrageous considering I. L. A. has 15 members (in San Pedro) and the International Longshoremen-Warehousemen's Union has 3000. International Longshoremen-Warehousemen Union has petitioned the labor board for certification to represent San Pedro

Apparently Bridges' conviction is not rested at all upon his use of the word "outrageous." The remainder of the telegram fairly construed appears to be a statement that if the court's decree should be enforced there would be a strike. It is not claimed that such a strike would have been in violation of the terms of the decree, nor that in any other way it would have run afoul of the law of California. On no construction, therefore, can the telegram be taken as a threat either by Bridges or the union to follow an illegal course of action.

Moreover, this statement of Bridges was made to the Secretary of Labor, who is charged with official duties in connection with the prevention of strikes. Whatever the cause might be if a strike was threatened or possible the Secretary was entitled to receive all available information. Indeed, the Supreme Court of California recognized that, publication in the newspapers aside, in sending the message to the Secretary, Bridges was exercising the right of petition to a duly accredited representative of the United States Government, a right protected by the First Amendment.[21]

It must be recognized that Bridges was a prominent labor leader speaking at a time when public interest in the particular labor controversy was at its height. The observations we have previously made here upon the time-

longshoremen with International Longshoremen Association denied representation because it represents only 15 men. Board hearing held; decision now pending. Attempted enforcement of Schmidt decision will tie up port of Los Angeles and involve entire Pacific Coast. International Longshoremen-Warehousemen Union, representing over 11,000 of the 12,000 longshoremen on the Pacific Coast, does not intend to allow state courts to override the majority vote of members in choosing its officers and representatives and to override the National Labor Relations Board."

[21] See *Bridges* v. *Superior Court, supra,* 14 Cal. 2d at 493. Cf. *White* v. *Nicholls,* 3 How. 266.

liness and importance of utterances as emphasizing rather than diminishing the value of constitutional protection, and upon the breadth and seriousness of the censorial effects of punishing publications in the manner followed below, are certainly no less applicable to a leading spokesman for labor than to a powerful newspaper taking another point of view.

In looking at the reason advanced in support of the judgment of contempt, we find that here, too, the possibility of causing unfair disposition of a pending case is the major justification asserted. And here again the gist of the offense, according to the court below, is intimidation.

Let us assume that the telegram could be construed as an announcement of Bridges' intention to call a strike, something which, it is admitted, neither the general law of California nor the court's decree prohibited. With an eye on the realities of the situation, we cannot assume that Judge Schmidt was unaware of the possibility of a strike as a consequence of his decision. If he was not intimidated by the facts themselves, we do not believe that the most explicit statement of them could have sidetracked the course of justice. Again, we find exaggeration in the conclusion that the utterance even "tended" to interfere with justice. If there was electricity in the atmosphere, it was generated by the facts; the charge added by the Bridges telegram can be dismissed as negligible. The words of Mr. Justice Holmes, spoken in reference to very different facts, seem entirely applicable here: "I confess that I cannot find in all this or in the evidence in the case anything that would have affected a mind of reasonable fortitude, and still less can I find there anything that obstructed the administration of justice in any sense that I possibly can give to those words." *Toledo Newspaper Co. v. United States, supra,* 247 U. S. at 425.

*Reversed.*

MR. JUSTICE FRANKFURTER, with whom concurred the CHIEF JUSTICE, MR. JUSTICE ROBERTS and MR. JUSTICE BYRNES, dissenting.

Our whole history repels the view that it is an exercise of one of the civil liberties secured by the Bill of Rights for a leader of a large following or for a powerful metropolitan newspaper to attempt to overawe a judge in a matter immediately pending before him. The view of the majority deprives California of means for securing to its citizens justice according to law—means which, since the Union was founded, have been the possession, hitherto unchallenged, of all the states. This sudden break with the uninterrupted course of constitutional history has no constitutional warrant. To find justification for such deprivation of the historic powers of the states is to misconceive the idea of freedom of thought and speech as guaranteed by the Constitution.

Deeming it more important than ever before to enforce civil liberties with a generous outlook, but deeming it no less essential for the assurance of civil liberties that the federal system founded upon the Constitution be maintained, we believe that the careful ambiguities and silences of the majority opinion call for a full exposition of the issues in these cases.

While the immediate question is that of determining the power of the courts of California to deal with attempts to coerce their judgments in litigation immediately before them, the consequence of the Court's ruling today is a denial to the people of the forty-eight states of a right which they have always regarded as essential for the effective exercise of the judicial process, as well as a denial to the Congress of powers which were exercised from the very beginning even by the framers of the Constitution themselves. To be sure, the majority do not in so many words hold that trial by newspapers has constitutional

sanctity. But the atmosphere of their opinion and several of its phrases mean that or they mean nothing. Certainly, the opinion is devoid of any frank recognition of the right of courts to deal with utterances calculated to intimidate the fair course of justice—a right which hitherto all the states have from time to time seen fit to confer upon their courts and which Congress conferred upon the federal courts in the Judiciary Act of 1789. If all that is decided today is that the majority deem the specific interferences with the administration of justice in California so tenuously related to the right of California to keep its courts free from coercion as to constitute a check upon free speech rather than upon impartial justice, it would be well to say so. Matters that involve so deeply the powers of the states, and that put to the test the professions by this Court of self-restraint in nullifying the political powers of state and nation, should not be left clouded.

We are not even vouchsafed reference to the specific provision of the Constitution which renders states powerless to insist upon trial by courts rather than trial by newspapers. So far as the Congress of the United States is concerned, we are referred to the First Amendment. That is specific. But we are here dealing with limitations upon California—with restraints upon the states. To say that the protection of freedom of speech of the First Amendment is absorbed by the Fourteenth does not say enough. Which one of the various limitations upon state power introduced by the Fourteenth Amendment absorbs the First? Some provisions of the Fourteenth Amendment apply only to citizens and one of the petitioners here is an alien; some of its provisions apply only to natural persons, and another petitioner here is a corporation. See *Hague* v. *C. I. O.*, 307 U. S. 496, 514, and cases cited. Only the Due Process Clause assures constitutional protection of civil liberties to aliens and corporations. Corporations

cannot claim for themselves the "liberty" which the Due Process Clause guarantees. That clause protects only their property. *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535. The majority opinion is strangely silent in failing to avow the specific constitutional provision upon which its decision rests.

These are not academic debating points or technical niceties. Those who have gone before us have admonished us "that in a free representative government nothing is more fundamental than the right of the people through their appointed servants to govern themselves in accordance with their own will, except so far as they have restrained themselves by constitutional limits specifically established, and that in our peculiar dual form of government nothing is more fundamental than the full power of the State to order its own affairs and govern its own people, except so far as the Federal Constitution expressly or by fair implication has withdrawn that power. The power of the people of the States to make and alter their laws at pleasure is the greatest security for liberty and justice . . . We are not invested with the jurisdiction to pass upon the expediency, wisdom or justice of the laws of the States as declared by their courts, but only to determine their conformity with the Federal Constitution and the paramount laws enacted pursuant to it. Under the guise of interpreting the Constitution we must take care that we do not import into the discussion our own personal views of what would be wise, just and fitting rules of government to be adopted by a free people and confound them with constitutional limitations." *Twining* v. *New Jersey,* 211 U. S. 78, 106–07.

In a series of opinions as uncompromising as any in its history, this Court has settled that the fullest opportunities for free discussion are "implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment," protected against attempted invasion by

the states. *Palko* v. *Connecticut,* 302 U. S. 319, 324–25. The channels of inquiry and thought must be kept open to new conquests of reason, however odious their expression may be to the prevailing climate of opinion. But liberty, "in each of its phases, has its history and connotation." Whether a particular state action violates "the essential attributes of that liberty" must be judged in the light of the liberty that is invoked and the curtailment that is challenged. *Near* v. *Minnesota,* 283 U. S. 697, 708. For "the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process." *Clark* v. *United States,* 289 U. S. 1, 13.

Free speech is not so absolute or irrational a conception as to imply paralysis of the means for effective protection of all the freedoms secured by the Bill of Rights. Compare Lincoln's Message to Congress in Special Session, July 4, 1861, 7 Richardson, Messages and Papers of the Presidents, pp. 3221–3232. In the cases before us, the claims on behalf of freedom of speech and of the press encounter claims on behalf of liberties no less precious. California asserts her right to do what she has done as a means of safeguarding her system of justice.

The administration of justice by an impartial judiciary has been basic to our conception of freedom ever since Magna Carta. It is the concern not merely of the immediate litigants. Its assurance is everyone's concern, and it is protected by the liberty guaranteed by the Fourteenth Amendment. That is why this Court has outlawed mob domination of a courtroom, *Moore* v. *Dempsey,* 261 U. S. 86, mental coercion of a defendant, *Chambers* v.

*Florida,* 309 U. S. 227, a judicial system which does not provide disinterested judges, *Tumey* v. *Ohio,* 273 U. S. 510, and discriminatory selection of jurors, *Pierre* v. *Louisiana,* 306 U. S. 354; *Smith* v. *Texas,* 311 U. S. 128.

A trial is not a "free trade in ideas," nor is the best test of truth in a courtroom "the power of the thought to get itself accepted in the competition of the market." Compare Mr. Justice Holmes in *Abrams* v. *United States,* 250 U. S. 616, 630. A court is a forum with strictly defined limits for discussion. It is circumscribed in the range of its inquiry and in its methods by the Constitution, by laws, and by age-old traditions. Its judges are restrained in their freedom of expression by historic compulsions resting on no other officials of government. They are so circumscribed precisely because judges have in their keeping the enforcement of rights and the protection of liberties which, according to the wisdom of the ages, can only be enforced and protected by observing such methods and traditions.

The dependence of society upon an unswerved judiciary is such a commonplace in the history of freedom that the means by which it is maintained are too frequently taken for granted without heed to the conditions which alone make it possible. The rôle of courts of justice in our society has been the theme of statesmen and historians and constitution makers. It is perhaps best expressed in the Massachusetts Declaration of Rights:

"It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit."

The Constitution was not conceived as a doctrinaire document, nor was the Bill of Rights intended as a collection of popular slogans. We are dealing with instruments

of government. We cannot read into the Fourteenth Amendment the freedom of speech and of the press protected by the First Amendment and at the same time read out age-old means employed by states for securing the calm course of justice. The Fourteenth Amendment does not forbid a state to continue the historic process of prohibiting expressions calculated to subvert a specific exercise of judicial power. So to assure the impartial accomplishment of justice is not an abridgment of freedom of speech or freedom of the press, as these phases of liberty have heretofore been conceived even by the stoutest libertarians. In fact, these liberties themselves depend upon an untrammeled judiciary whose passions are not even unconsciously aroused and whose minds are not distorted by extra-judicial considerations.

Of course freedom of speech and of the press are essential to the enlightenment of a free people and in restraining those who wield power. Particularly should this freedom be employed in comment upon the work of courts, who are without many influences ordinarily making for humor and humility, twin antidotes to the corrosion of power. But the Bill of Rights is not self-destructive. Freedom of expression can hardly carry implications that nullify the guarantees of impartial trials. And since courts are the ultimate resorts for vindicating the Bill of Rights, a state may surely authorize appropriate historic means to assure that the process for such vindication be not wrenched from its rational tracks into the more primitive mêlée of passion and pressure. The need is great that courts be criticized, but just as great that they be allowed to do their duty.

The "liberty" secured by the Fourteenth Amendment summarizes the experience of history. And the power exerted by the courts of California is deeply rooted in the system of administering justice evolved by liberty-loving English-speaking peoples. From the earliest days of the

English courts, they have encountered obstructions to doing that for which they exist, namely, to administer justice impartially and solely with reference to what comes before them. These interferences were of diverse kinds. But they were all covered by the infelicitous phrase "contempt of court," and the means for dealing with them is historically known as the power of courts to punish for contempt. As is true of many aspects of our legal institutions, the settled doctrines concerning the mode of procedure for exercising the power of contempt became established on dubious historical authority. Exact legal scholarship has controverted much pertaining to the origin of summary proceedings for contempt. See Sir John Fox, The History of Contempt of Court, *passim*. But there is no doubt that, since the early eighteenth century, the power to punish for contempt for intrusions into the living process of adjudication has been an unquestioned characteristic of English courts and of the courts of this country.

The judicatures of the English-speaking world, including the courts of the United States and of the forty-eight states, have from time to time recognized and exercised the power now challenged. (For partial lists of cases, see Nelles and King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 525, 554; Sullivan, Contempts by Publication, pp. 185 *et seq.*) A declaratory formulation of the common law was written into the Judiciary Act of 1789 (§ 17, 1 Stat. 73, 83) by Oliver Ellsworth, one of the framers of the Constitution, later to become Chief Justice; the power was early recognized as incidental to the very existence of courts in a succession of opinions in this Court (*United States* v. *Hudson*, 7 Cranch 32; *Anderson* v. *Dunn*, 6 Wheat. 204, 227; *Ex parte Kearney*, 7 Wheat. 38); it was expounded and supported by the great Commentaries that so largely influenced the shaping of our law in the late eighteenth and early nineteenth cen-

turies, those of Blackstone, Kent and Story; its historic continuity withstood attack against state action under the Due Process Clause, now again invoked, *Eilenbecker* v. *Plymouth County,* 134 U. S. 31; and see *Ex parte Robinson,* 19 Wall. 505; *Ex parte Terry,* 128 U. S. 289; *Savin, Petitioner,* 131 U. S. 267.[1]

---

[1] "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution. . . . To fine for contempt—imprison for contumacy—inforce the observance of order, &c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States* v. *Hudson,* 7 Cranch 32, 34 (1812).

"That 'the safety of the people is the supreme law,' not only comports with, but is indispensable to, the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is, that Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution.

"It is true, that the Courts of justice of the United States are vested, by express statute provision, with power to fine and imprison for contempts; but it does not follow, from this circumstance, that they would not have exercised that power without the aid of the statute, or not, in cases, if such should occur, to which such statute provision may not extend; on the contrary, it is a legislative assertion of this right, as incidental to a grant of judicial power, and can only be considered either as an instance of abundant caution, or a legislative declaration, that the power of punishing for contempt shall not extend beyond its known and acknowledged limits of fine and imprisonment." *Anderson* v. *Dunn,* 6 Wheat. 204, 227–28 (1821).

"The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." *Ex parte Robinson,* 19 Wall. 505, 510 (1874).

"The act of 1789 did not define what were contempts of the authority of the courts of the United States, in any cause or hearing before them,

As in the exercise of all power, it was abused. Some English judges extended their authority for checking interferences with judicial business actually in hand, to "lay by the heel" those responsible for "scandalizing the court," that is, bringing it into general disrepute. Such foolishness has long since been disavowed in England and has never found lodgment here. But even the technical power of punishing interference with the court's business is susceptible of abuse. As early as 1809, Pennsylvania restricted the power to inflict summary punishment for contempts to a closely defined class of misconduct, and provided the ordinary criminal procedure for other forms of interferences with a pending cause. 1808–09 Pa. Acts, c. 78, p. 146.[2] The flagrant case of Judge Peck[3] led Con-

nor did it prescribe any special procedure for determining a matter of contempt. Under that statute the question whether particular acts constituted a contempt, as well as the mode of proceeding against the offender, was left to be determined according to such established rules and principles of the common law as were applicable to our situation." *Savin, Petitioner*, 131 U. S. 267, 275–76 (1889).

[2] For the history leading up to the Pennsylvania legislation, see *Respublica* v. *Oswald*, 1 Dall. 319 (1788), particularly note beginning at p. 329; *Respublica* v. *Passmore*, 3 Yeates (Pa.) 441; Hamilton, Report of the Trial and Acquittal of Justices of the Supreme Court of Pennsylvania (1805). Cf. *Hollingsworth* v. *Duane*, Wall. Sr. 77, Fed. Cas. No. 6616; *United States* v. *Duane*, Wall. Sr. 102, Fed. Cas. No. 14997.

[3] The charge against Judge Peck was that he punished counsel for contempt after the final decree of the particular litigation had been rendered and the necessary steps for an appeal had been taken, and after the judge had published his opinion in a newspaper and plaintiff in reply had submitted to the public "a concise statement of some of the principal errors into which your petitioner [the accused counsel] had fallen." Stansbury, Report of the Trial of James H. Peck (1833). In view of their immediate professional responsibility, the eminent lawyers who had charge of the impeachment proceedings against Judge Peck would naturally take the least tolerant view of the power of courts to punish for contempt. Yet all the managers of the House of Representatives (James Buchanan of Pennsylvania,

gress to pass the Act of March 2, 1831, 4 Stat. 487, 28
U. S. C. § 385, the scope of which we recently considered.
*Nye* v. *United States,* 313 U. S. 33. A number of states
copied the federal statute. It would be pedantic to trace
the course of legislation and of adjudication on this sub-
ject in our half-hundred jurisdictions. Suffice it to say
that the hitherto unchallenged power of American states
to clothe their courts with authority to punish for con-
tempt was thus summarized only recently by Mr. Chief
Justice Hughes in the leading case vindicating the liberty
of the press against state action: "There is also the con-
ceded authority of courts to punish for contempt when
publications directly tend to prevent the proper discharge
of judicial functions." *Near* v. *Minnesota,* 283 U. S.
697, 715.[4]

---

George E. McDuffie of South Carolina, Ambrose Spencer and Henry
Storrs of New York, Charles E. Wickliffe of Kentucky) acknowledged
the historic power to punish interferences calculated to obstruct the
exercise of the judicial function in a pending cause. They did so sub-
stantially in the terms now here challenged. *Ibid.,* pp. 91, 291, 293,
382, 400. The following from Mr. Storrs' argument is a fair sample:

"The law of contempts, when confined to the protection of the courts
in their proper constitutional action and duties, and to the punishment
of every direct or indirect interference with the exercise of their powers
and the protection of those who are concerned in them as parties, jurors,
witnesses and officers of justice in aid of the administration of their func-
tions, was too well established and too well sustained by principle
as well as positive law, to be doubted or disturbed; and, confined to
its proper limits, admitted of all reasonable certainty in its definitions
of crime. But if extended to the case of general libel, there was no
security for personal liberty but the discretion or feeling of a judge."
*Ibid.,* p. 400.

[4] It is relevant to add that this expressed the view of Mr. Justice
Holmes and Mr. Justice Brandeis whose opinions have had such a
powerful influence in pressing the Due Process Clause to the service
of freedom of speech and of the press. In two earlier cases of summary
punishment for contempt they strongly dissented because they found
that the limits set by the Act of 1831 had been exceeded. *Toledo News-*

It is trifling with great issues to suggest that the question before us is whether eighteenth-century restraints upon the freedom of the press should now be revived. The question is rather whether nineteenth- and twentieth-century American institutions should be abrogated by judicial fiat.

That a state may, under appropriate circumstances, prevent interference with specific exercises of the process of impartial adjudication does not mean that its people lose the right to condemn decisions or the judges who render them. Judges as persons, or courts as institutions, are entitled to no greater immunity from criticism than other persons or institutions. Just because the holders of judicial office are identified with the interests of justice they may forget their common human frailties and fallibilities. There have sometimes been martinets upon the bench as there have also been pompous wielders of authority who have used the paraphernalia of power in support of what they called their dignity. Therefore judges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt.[5] "A

---

paper *Co.* v. *United States,* 247 U. S. 402, and *Craig* v. *Hecht,* 263 U. S. 255. But in neither case did they suggest any constitutional difficulty in the exercise of the contempt power arising from the prohibition of the First Amendment.

[5] See the Lincoln Day, 1898, address of Mr. Justice Brewer, *Government by Injunction,* 15 Nat. Corp. Rep. 848, 849: "It is a mistake to suppose that the Supreme Court is either honored or helped by being spoken of as beyond criticism. On the contrary, the life and character of its justices should be the objects of constant watchfulness by all, and its judgments subject to the freest criticism. The time is past in the history of the world when any living man or body of men can be set on a pedestal and decorated with a halo. True, many criticisms may be, like their authors, devoid of good taste, but better all sorts of criticism than no criticism at all. The moving waters are full of life and health; only in the still waters is stagnation and death."

man cannot be summarily laid by the heels because his words may make public feeling more unfavorable in case the judge should be asked to act at some later date, any more than he can for exciting public feeling against the judge for what he already has done." Mr. Justice Holmes in *Craig* v. *Hecht,* 263 U. S. 255, 281–82. But the Constitution does not bar a state from acting on the theory of our system of justice, that the "conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado,* 205 U. S. 454, 462. The theory of our system of justice as thus stated for the Court by Mr. Justice Holmes has never been questioned by any member of the Court. It was questioned neither by Mr. Justice Harlan nor by Mr. Justice Brewer in their dissents in the *Patterson* case. The differences in that case concerned the question whether "there is to be found in the Fourteenth Amendment a prohibition . . . similar to that in the First," and, if so, what the scope of that protection is. The first question was settled in the affirmative by a series of cases beginning with *Gitlow* v. *New York,* 268 U. S. 652. And that the scope of the First Amendment was broader than was intimated in the opinion in the *Patterson* case, was later recognized by Mr. Justice Holmes, speaking for the Court, in *Schenck* v. *United States,* 249 U. S. 47. But that the conventional power to punish for contempt is not a censorship in advance but a punishment for past conduct and, as such, like prosecution for a criminal libel, is not offensive either to the First or to the Fourteenth Amendments, has never been doubted throughout this Court's history.

This conception of justice, the product of a long and arduous effort in the history of freedom, is one of the greatest achievements of civilization, and is not less to be cherished at a time when it is repudiated and derided by

powerful régimes. "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers* v. *Baltimore & Ohio R. Co.,* 207 U. S. 142, 148. This has nothing to do with curtailing expression of opinion, be it political, economic, or religious, that may be offensive to orthodox views. It has to do with the power of the state to discharge an indispensable function of civilized society, that of adjudicating controversies between its citizens and between citizens and the state through legal tribunals in accordance with their historic procedures. Courts and judges must take their share of the gains and pains of discussion which is unfettered except by laws of libel, by self-restraint, and by good taste. Winds of doctrine should freely blow for the promotion of good and the correction of evil. Nor should restrictions be permitted that cramp the feeling of freedom in the use of tongue or pen regardless of the temper or the truth of what may be uttered.

Comment however forthright is one thing. Intimidation with respect to specific matters still in judicial suspense, quite another. See Laski, Procedure for Constructive Contempt in England, 41 Harv. L. Rev. 1031, 1034; Goodhart, Newspapers and Contempt in English Law, 48 Harv. L. Rev. 885. A publication intended to teach the judge a lesson, or to vent spleen, or to discredit him, or to influence him in his future conduct, would not justify exercise of the contempt power. Compare Judge Learned Hand in *Ex parte Craig,* 282 F. 138, 160–61. It must refer to a matter under consideration and constitute in effect a threat to its impartial disposition. It must be calculated to create an atmospheric pressure incompatible with rational, impartial adjudication. But to interfere with justice it need not succeed. As with other offenses, the state should be able to proscribe attempts that fail because of the danger that attempts may succeed. The pur-

pose, it will do no harm to repeat, is not to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed. The purpose is to protect immediate litigants and the public from the mischievous danger of an unfree or coerced tribunal. The power should be invoked only where the adjudicatory process may be hampered or hindered in its calm, detached, and fearless discharge of its duty on the basis of what has been submitted in court. The belief that decisions are so reached is the source of the confidence on which law ultimately rests.

It will not do to argue that a state cannot permit its judges to resist coercive interference with their work in hand because other officials of government must endure such obstructions. In such matters "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349. Presidents and governors and legislators are political officials traditionally subject to political influence and the rough and tumble of the hustings, who have open to them traditional means of self-defense. In a very immediate sense, legislators and executives express the popular will. But judges do not express the popular will in any ordinary meaning of the term. The limited power to punish for contempt which is here involved wholly rejects any assumption that judges are superior to other officials. They merely exercise a function historically and intrinsically different. From that difference is drawn the power which has behind it the authority and the wisdom of our whole history. Because the function of judges and that of other officials in special situations may approach similarity, hard cases can be put which logically may contradict the special quality of the judicial process. "But the provisions of the Constitution are not mathematical formulas having their essence in their form;

they are organic living institutions transplanted frcm English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." *Gompers* v. *United States,* 233 U. S. 604, 610.

We are charged here with the duty, always delicate, of sitting in judgment on state power. We must be fastidiously careful not to make our private views the measure of constitutional authority. To be sure, we are here concerned with an appeal to the great liberties which the Constitution assures to all our people, even against state denial. When a substantial claim of an abridgment of these liberties is advanced, the presumption of validity that belongs to an exercise of state power must not be allowed to impair such a liberty or to check our close examination of the merits of the controversy. But the utmost protection to be accorded to freedom of speech and of the press cannot displace our duty to give due regard also to the state's power to deal with what may essentially be local situations.

Because freedom of public expression alone assures the unfolding of truth, it is indispensable to the democratic process. But even that freedom is not an absolute and is not predetermined. By a doctrinaire overstatement of its scope and by giving it an illusory absolute appearance, there is danger of thwarting the free choice and the responsibility of exercising it which are basic to a democratic society. While we are reviewing a judgment of the California Supreme Court and not an act of its legislature or the voice of the people of California formally expressed in its constitution, we are in fact passing judgment on "the power of the State as a whole." *Rippey* v. *Texas,* 193 U. S. 504, 509; *Skiriotes* v. *Florida,* 313 U. S. 69, 79; *United Gas Co.* v. *Texas,* 303 U. S. 123, 142; *Missouri* v. *Dockery,* 191 U. S. 165, 171; *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239, 244.

By the constitution of California, as authoritatively construed by its Supreme Court and therefore as binding upon this Court as though ratified by all the voters of California, the citizens of that state have chosen to place in its courts the power, as we have defined it, to insure impartial justice. If the citizens of California have other desires, if they want to permit the free play of modern publicity in connection with pending litigation, it is within their easy power to say so and to have their way. They have ready means of amending their constitution and they have frequently made use of them. We are, after all, sitting over three thousand miles away from a great state, without intimate knowledge of its habits and its needs, in a matter which does not cut across the affirmative powers of the national government. Some play of policy must be left to the states in the task of accommodating individual rights and the overriding public well-being which makes those rights possible. How are we to know whether an easy-going or stiffer view of what affects the actual administration of justice is appropriate to local circumstances? How are we to say that California has no right to model its judiciary upon the qualities and standards attained by the English administration of justice, and to use means deemed appropriate to that end by English courts.[6] It is surely an arbitrary judgment to say that the

---

[6] "It is most important that the administration of justice in this country should not be hampered as it is hampered in some other countries, and it is not enlarging the jurisdiction of this court—it is refusing to narrow the jurisdiction of this court—when we say that we are determined while we are here to do nothing to substitute in this country trial by newspaper for trial by jury; and those who attempt to introduce that system in this country, even in its first beginnings, must be prepared to suffer for it. Probably the proper punishment—and it is one which this court may yet have to award if the punishment we are about to award proves insufficient—will be imprisonment in cases of this kind. There is no question about that, because we cannot shut our eyes to the fact that newspapers are owned by

Due Process Clause denies California that right. For respect for "the liberty of the subject," though not explicitly written into a constitution, is so deeply embedded in the very texture of English feeling and conscience [7] that it survives, as the pages of Hansard abundantly prove, the exigencies of the life and death struggle of the British people. See, *e. g.,* Carr, Concerning English Administrative Law, c. 3 ("Crisis Legislation").

The rule of law applied in these cases by the California court forbade publications having "a reasonable tendency to interfere with the orderly administration of justice in pending actions." To deny that this age-old formulation of the prohibition against interference with dispassionate adjudication is properly confined to the substantive evil is not only to turn one's back on history but also to indulge in an idle play on words, unworthy of constitutional adjudication. It was urged before us that the words "reasonable tendency" had a fatal pervasiveness, and that their replacement by "clear and present danger" was required to state a constitutionally permissible rule of law. The Constitution, as we have recently had occasion to remark, is not a formulary. *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444. Nor does it require displacement of an historic test by a phrase which first gained currency on March 3, 1919. *Schenck* v. *United States,* 249 U. S. 47. Our duty is not ended with the recita-

wealthy people, and it may even happen that they will take the chances of the fine and pay it cheerfully and will not feel that they have then paid too much for the advertisement." *Rex* v. *Clarke,* 103 L. T. R. (N. S.) 636, 640.

[7] Thus, in England, the "third degree" never gained a foothold, and its emergence was impressively resisted long before it was outlawed here. See 217 Parl. Deb. (Commons) cols. 1303 *et seq.* (May 17, 1928); Inquiry in regard to the Interrogation by the Police of Miss Savidge, Cmd. 3147 (1928); Report of the Royal Commission on Police Powers and Procedure, Cmd. 3297 (1929).

tion of phrases that are the short-hand of a complicated historic process. The phrase "clear and present danger" is merely a justification for curbing utterance where that is warranted by the substantive evil to be prevented. The phrase itself is an expression of tendency and not of accomplishment, and the literary difference between it and "reasonable tendency" is not of constitutional dimension.

Here the substantive evil to be eliminated is interference with impartial adjudication. To determine what interferences may be made the basis for contempt tenders precisely the same kind of issues as that to which the "clear and present danger" test gives rise. "It is a question of proximity and degree." *Schenck* v. *United States, supra* at 52. And this, according to Mr. Justice Brandeis "is a rule of reason . . . Like many other rules for human conduct, it can be applied correctly only by the exercise of good judgment." *Schaefer* v. *United States,* 251 U. S. 466, 482–83. Has California's judgment here undermined liberties protected by the Constitution? In common with other questions of degree, this is to be solved not by short-hand phrases but by consideration of the circumstances of the particular case. One cannot yell "Fire" in a crowded theater; police officers cannot turn their questioning into an instrument of mental oppression. *Chambers* v. *Florida,* 309 U. S. 227.

If a rule of state law is not confined to the evil which may be dealt with but places an indiscriminate ban on public expression that operates as an overhanging threat to free discussion, it must fall without regard to the facts of the particular case. This is true whether the rule of law be declared in a statute or in a decision of a court. *Thornhill* v. *Alabama,* 310 U. S. 88; *Cantwell* v. *Connecticut,* 310 U. S. 296. In the cases before us there was no blanket or dragnet prohibition of utterance affecting courts. Freedom to criticize their work, to assail generally

the institution of courts, to report and comment on matters in litigation but not to subvert the process of deciding—all this freedom was respected. Only the state's interest in calm and orderly decisions, which represented also the constitutional right of the parties, led it to condemn coercive utterances directed towards a pending proceeding. California, speaking through its courts, acted because of their conclusion that such utterances undermined the conditions necessary for fair adjudication.

It is suggested that threats, by discussion, to untrammeled decisions by courts are the most natural expressions when public feeling runs highest. But it does not follow that states are left powerless to prevent their courts from being subverted by outside pressure when the need for impartiality and fair proceeding is greatest. To say that the framers of the Constitution sanctified veiled violence through coercive speech directed against those charged with adjudication is not merely to make violence an ingredient of justice; it mocks the very ideal of justice by respecting its forms while stultifying its uncontaminated exercise.

We turn to the specific cases before us:

The earliest editorial involved in No. 3, "Sit-strikers Convicted," commented upon a case the day after a jury had returned a verdict and the day before the trial judge was to pronounce sentence and hear motions for a new trial and applications for probation. On its face the editorial merely expressed exulting approval of the verdict, a completed action of the court, and there is nothing in the record to give it additional significance. The same is true of the second editorial, "Fall of an Ex-Queen," which luridly draws a moral from a verdict of guilty in a sordid trial and which was published eight days prior to the day set for imposing sentence. In both instances imposition of sentences was immediately pending at the time of publication, but in neither case was there any declaration,

direct or sly, in regard to this. As the special guardian of the Bill of Rights, this Court is under the heaviest responsibility to safeguard the liberties guaranteed from any encroachment, however astutely disguised. The Due Process Clause of the Fourteenth Amendment protects the right to comment on a judicial proceeding, so long as this is not done in a manner interfering with the impartial disposition of a litigation. There is no indication that more was done in these editorials; they were not close threats to the judicial function which a state should be able to restrain. We agree that the judgment of the state court in this regard should not stand.

"Probation for Gorillas?", the third editorial, is a different matter. On April 22, 1938, a Los Angeles jury found two defendants guilty of assault with a deadly weapon and of a conspiracy to violate another section of the penal code. On May 2nd, the defendants applied for probation and the trial judge on the same day set June 7th as the day for disposing of this application and for sentencing the defendants. In the Los Angeles Times for May 5th appeared the following editorial entitled "Probation for Gorillas?":

"Two members of Dave Beck's wrecking crew, entertainment committee, goon squad or gorillas, having been convicted in Superior Court of assaulting nonunion truck drivers, have asked for probation. Presumably they will say they are 'first offenders,' or plead that they were merely indulging a playful exuberance when, with slingshots, they fired steel missiles at men whose only offense was wishing to work for a living without paying tribute to the erstwhile boss of Seattle.

"Sluggers for pay, like murderers for profit, are in a slightly different category from ordinary criminals. Men who commit mayhem for wages are not merely violators of the peace and dignity of the State; they are also conspirators against it. The man who burgles because his

children are hungry may have some claim on public sympathy. He whose crime is one of impulse may be entitled to lenity. But he who hires out his muscles for the creation of disorder and in aid of a racket is a deliberate foe of organized society and should be penalized accordingly.

"It will teach no lesson to other thugs to put these men on good behavior for a limited time. Their 'duty' would simply be taken over by others like them. If Beck's thugs, however, are made to realize that they face San Quentin when they are caught, it will tend to make their disreputable occupation unpopular. Judge A. A. Scott will make a serious mistake if he grants probation to Matthew Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill."

This editorial was published three days after the trial judge had fixed the time for sentencing and for passing on an application for probation, and a month prior to the date set. It consisted of a sustained attack on the defendants, with an explicit demand of the judge that they be denied probation and be sent "to the jute mill." This meant, in California idiom, that in the exercise of his discretion the judge should treat the offense as a felony, with all its dire consequences, and not as a misdemeanor. Under the California Penal Code the trial judge had wide discretion in sentencing the defendants: he could sentence them to the county jail for one year or less, or to the state penitentiary for two years. The editorial demanded that he take the latter alternative and send the defendants to the "jute mill" of the state penitentiary. A powerful newspaper admonished a judge, who within a year would have to secure popular approval if he desired continuance in office, that failure to comply with its demands would be "a serious mistake." Clearly, the state court was justified in treating this as a threat to impartial adjudication. It is

too naïve to suggest that the editorial was written with a feeling of impotence and an intention to utter idle words. The publication of the editorial was hardly an exercise in futility. If it is true of juries it is not wholly untrue of judges that they too may be "impregnated by the environing atmosphere." Mr. Justice Holmes in *Frank* v. *Mangum*, 237 U. S. 309, 349. California should not be denied the right to free its courts from such coercive, extraneous influences; it can thus assure its citizens of their constitutional right of a fair trial. Here there was a real and substantial manifestation of an endeavor to exert outside influence. A powerful newspaper brought its full coercive power to bear in demanding a particular sentence. If such sentence had been imposed, readers might assume that the court had been influenced in its action; if lesser punishment had been imposed, at least a portion of the community might be stirred to resentment. It cannot be denied that even a judge may be affected by such a quandary. We cannot say that the state court was out of bounds in concluding that such conduct offends the free course of justice. Comment after the imposition of sentence—criticism, however unrestrained, of its severity or lenience or disparity, cf. *Ambard* v. *Attorney General for Trinidad and Tobago*, [1936] A. C. 322,—is an exercise of the right of free discussion. But to deny the states power to check a serious attempt at dictating, from without, the sentence to be imposed in a pending case, is to deny the right to impartial justice as it was cherished by the founders of the Republic and by the framers of the Fourteenth Amendment. It would erect into a constitutional right, opportunities for abuse of utterance interfering with the dispassionate exercise of the judicial function. See *Rex* v. *Daily Mail*, [1921] 2 K. B. 733, 749; *Attorney General* v. *Tonks*, [1939] N. Z. L. R. 533.

In *No. 1*, Harry R. Bridges challenges a judgment by the Superior Court of California fining him $125 for con-

tempt. He was president of the International Longshoremen's and Warehousemen's Union, an affiliate of the Committee for Industrial Organization, and also West Coast director for the C. I. O. The I. L. W. U. was largely composed of men who had withdrawn from the International Longshoremen's Association, an affiliate of the American Federation of Labor. In the fall of 1937 the rival longshoremen's unions were struggling for control of a local in San Pedro Harbor. The officers of this local, carrying most of its members with them, sought to transfer the allegiance of the local to I. L. W. U. Thereupon, longshoremen remaining in I. L. A. brought suit in the Superior Court of Los Angeles county against the local and its officers. On January 21, 1938, Judge Schmidt, sitting in the Superior Court, enjoined the officers from working on behalf of I. L. W. U. and appointed a receiver to conduct the affairs of the local as an affiliate of the A. F. of L., by taking charge of the outstanding bargaining agreements of the local and of its hiring hall, which is the physical mainstay of such a union. Judge Schmidt promptly stayed enforcement of his decree, and on January 24th the defendants in the injunction suit moved for a new trial and for vacation of the judgment. In view of its local setting, the case aroused great public interest. The waterfront situation on the Pacific Coast was also watched by the United States Department of Labor, and Bridges had been in communication with the Secretary of Labor concerning the difficulties. On the same day that the motion for new trial was filed, Bridges sent the Secretary the following wire concerning Judge Schmidt's decree:

"This decision is outrageous considering I. L. A. has 15 members (in San Pedro) and the International Longshoremen-Warehousemen's Union has 3,000. International Longshoremen-Warehousemen Union has petitioned the Labor Board for certification to represent San

302

Pedro longshoremen with International Longshoremen Association denied representation because it represents only 15 men. Board hearing held; decision now pending. Attempted enforcement of Schmidt decision will tie up port of Los Angeles and involve entire Pacific Coast. International Longshoremen-Warehousemen Union, representing over 11,000 of the 12,000 longshoremen on the Pacific Coast, does not intend to allow state courts to override the majority vote of members in choosing its officers and representatives and to override the National Labor Relations Board."

This telegram duly found its way into the metropolitan newspapers of California. Bridges' responsibility for its publication is clear. His publication of the telegram in the Los Angeles and San Francisco papers is the basis of Bridges' conviction for contempt.

The publication of the telegram was regarded by the state supreme court as "a threat that if an attempt was made to enforce the decision, the ports of the entire Pacific Coast would be tied up" and "a direct challenge to the court that 11,000 longshoremen on the Pacific Coast would not abide by its decision." This occurred immediately after counsel had moved to set aside the judgment which was criticized, so unquestionably there was a threat to litigation obviously alive. It would be inadmissible dogmatism for us to say that in the context of the immediate case—the issues at stake, the environment in which the judge, the petitioner and the community were moving, the publication here made, at the time and in the manner it was made—this could not have dominated the mind of the judge before whom the matter was pending. Here too the state court's judgment should not be overturned.

The fact that the communication to the Secretary of Labor may have been privileged does not constitutionally protect whatever extraneous use may have been made

of the communication. It is said that the possibility of a strike, in case of an adverse ruling, must in any event have suggested itself to the private thoughts of a sophisticated judge. Therefore the publication of the Bridges telegram, we are told, merely gave that possibility public expression. To afford constitutional shelter for a definite attempt at coercing a court into a favorable decision because of the contingencies of frustration to which all judicial action is subject, is to hold, in effect, that the Constitution subordinates the judicial settlement of conflicts to the unfettered indulgence of violent speech. The mere fact that after an unfavorable decision men may, upon full consideration of their responsibilities as well as their rights, engage in a strike or a lockout, is a poor reason for denying a state the power to protect its courts from being bludgeoned by serious threats while a decision is hanging in the judicial balance. A vague, undetermined possibility that a decision of a court may lead to a serious manifestation of protest is one thing. The impact of a definite threat of action to prevent a decision is a wholly different matter. To deny such realities is to stultify law. Rights must be judged in their context and not *in vacuo.* Compare *Aikens* v. *Wisconsin,* 195 U. S. 194, 205; *Badders* v. *United States,* 240 U. S. 391, 393–94; *American Bank & Trust Co.* v. *Federal Bank,* 256 U. S. 350, 358. "All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community." Mr. Justice Brandeis in *Duplex Co.* v. *Deering,* 254 U. S. 443, 488.

The question concerning the narrow power we recognize always is—was there a real and substantial threat to the impartial decision by a court of a case actively pending before it? The threat must be close and direct; it must be directed towards a particular litigation. The litigation must be immediately pending. When a case is pending is

not a technical, lawyer's problem, but is to be determined by the substantial realities of the specific situation.[8] Danger of unbridled exercise of judicial power because of immunity from speech which is coercing is a figment of groundless fears. In addition to the internal censor of conscience, professional standards, the judgment of fellow judges and the bar, the popular judgment exercised in elections, the power of appellate courts, including this Court, there is the corrective power of the press and of public comment free to assert itself fully immediately upon completion of judicial conduct. Because courts, like other agencies, may at times exercise power arbitrarily and have done so, resort to this Court is open to determine whether, under the guise of protecting impartiality in specific litigation, encroachments have been made upon the liberties of speech and press. But instances of past arbitrariness afford no justification for reversing the course of history and denying the states power to continue to use time-honored safeguards to assure unbullied adjudications. All experience justifies the states in acting upon the conviction that a wrong decision in a particular case may best be forestalled or corrected by more rational means than coercive intrusion from outside the judicial process.

Since courts, although representing the law, *United States* v. *Shipp,* 203 U. S. 563, 574, are also sitting in judgment, as it were, on their own function in exercising their power to punish for contempt, it should be used only in flagrant cases and with the utmost forbearance. It is al-

---

[8] The present cases are very different from the situation that evoked dissent in *Craig* v. *Hecht,* 263 U. S. 255, 281: "It is not enough that somebody may hereafter move to have something done. There was nothing then awaiting decision when the petitioner's letter was published." And see *Glasgow Corporation* v. *Hedderwick & Sons* (1918) Sess. Cas. 639. Compare *State ex rel. Pulitzer Pub. Co.* v. *Coleman,* 152 S. W. 2d 640 (Mo. 1941).

ways better to err on the side of tolerance and even of disdainful indifference.

No objections were made before us to the procedure by which the charges of contempt were tried. But it is proper to point out that neither case was tried by a judge who had participated in the trials to which the publications referred. Compare *Cooke* v. *United States*, 267 U. S. 517, 539. So it is clear that a disinterested tribunal was furnished, and since the Constitution does not require a state to furnish jury trials, *Maxwell* v. *Dow*, 176 U. S. 581; *Palko* v. *Connecticut*, 302 U. S. 319, 324, and states have discretion in fashioning criminal remedies, *Tigner* v. *Texas*, 310 U. S. 141, the situation here is the same as though a state had made it a crime to publish utterance having a "reasonable tendency to interfere with the orderly administration of justice in pending actions," and not dissimilar from what the United States has done in § 135 of the Criminal Code.[9]

---

[9] 35 Stat. 1113, 18 U. S. C. § 241. "Whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or officer acting as such commissioner, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or officer acting as such commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein, shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both."