ROGERS, Justice.
 

 At the instance of the plaintiffs in this suit, a number of individuals and certain newspaper corporations and their officers and editors were served with rules and orders to appear before this Court on October 10, 1941, and to show cause why they
 
 *162
 
 should not he held in contempt of the Court and its authority.
 

 Plaintiffs in the rules alleged, in substance, that certain individuals named as defendants were guilty of contempt in that, with a view of prejudicing the public generally and of embarrassing and intimidating the Court, at meetings of the political faction with which they were affiliated, they made inflammatory speeches and participated in the adoption of resolutions vilifying and reflecting upon certain members of the Court; and that other individuals, named in the rules as members of a Citizens’ Voluntary Committee, were also guilty of contempt because of a letter written by them to the Governor offering their support in the situation confronting the State following this Court’s decision invalidating the reorganization amendment.
 

 The Times-Picayune Publishing Company and the Item Company, their proprietors and editors, were made defendants in the rules for contempt because, in the issues of their newspapers, appearing on July 8, July 9, July 11, July 13, and July 18, 1941, they published articles covering the meetings, speeches, resolutions, and the letter of the Voluntary Citizens’ Committee, as shown by copies of the newspapers which are attached to and made part of the rules.
 

 All the respondents appeared through counsel and filed written returns to the rules for contempt.
 

 The newspaper publications, their proprietors and editors, in addition to pleading the constitutional guarantee of freedom of the press, contended that the articles cornplained of did not constitute contempt in that they were merely news stories, giving accounts of political meetings held shortly after the decision of this Court and of resolutions adopted thereat and the text of the letter written by the Citizens’ Voluntary Committee.
 

 Counsel for these respondents argue that the insignificant play given to these news stories, in their brevity, in the headlines, and in the obscure sections of the newspapers in which they were displayed, conclusively shows that they were not published for the purpose of attempting to influence this Court to change its decision.
 

 The individual respondents in their returns to the rules to show cause denied that anything they had said or had done constituted contempt of this Court, and they expressly pleaded their right to freedom of speech and to peaceable assembly under the guarantees contained in both the State and Federal Constitutions.
 

 Inasmuch as the respondent newspapers, their proprietors and editors, have pleaded their immunity under the provisions of the State and Federal Constitutions guaranteeing freedom of the press, it is not necessary to consider their contention that the articles complained of are merely news stories and therefore did not constitute contempt. Under the recent decision of the Supreme Court of the United States in Bridges v. California and Times-Mirror Company v. Superior Court case, 62 S.Ct. 190, 86 L.Ed. -, which we have discussed to some extent, in the opinion handed down this day on other rules filed against the same newspaper publications, their proprietors and
 
 *164
 
 editors, these respondents can not be held in contempt.
 

 Regarding the newspaper articles in whatever light we may, we can not consider them as presenting “a clear'and present danger of substantive evils” as would justify the impairment of the constitutional right of freedom of the press as defined in the Bridges and Times-Mirror Company case.
 

 We do not find it necessary to reproduce or quote from all the news articles referred to in the rules for contempt. We do not agree, however, with the contention of counsel representing the individual respondents that the criticisms made by respondents in their speeches and resolutions were not couched in intemperate or bitter language. For example, according to the news article in the New Orleans Item of July 8, reporting a meeting of the Tenth Ward Independent Democratic Organization, the following statement was attributed to the respondent State Senator Lionel G. Ott:
 

 “A charge that ‘political racketeers’ connected with the old Long regime had initiated the current series of suits attacking the reform program of Governor Jones $ * * ”
 

 The news article also contained this statement:
 

 “Ott (referring to Senator Lionel G. Ott) said that a constitutional convention was the best way to ‘rectify action’ of the supreme court in calling the reorganization unconstitutonal and said he didn’t believe the supreme court judges could be re-elected.”
 

 The concluding paragraph of the article reads in part as follows :
 

 “With Campbell Palfrey (one of the respondents herein), Jones ward leader, presiding, the group adopted a resolution pledging its support to Governor Jones ‘in whatever fight he initiates’ to rid the state of ‘obstructionists of the old discredited state machine.’ ”
 

 According to the news article appearing in the New Orleans Item of the issue of July 18, 1941, ,a resolution was adopted by the precinct captains of the Seventh Ward Independent Democratic Organization reading in part as follows.:
 

 “The Seventh Ward Independent Democratic Organization has joined other ward groups in pledging support of Governor Sam Jones in his government reorganization plan, it was announced today by Walter Maignan, Leader.
 

 “Mr. Maignan said all precinct captains had endorsed the following resolution:
 

 “ ‘Whereas, all various elements of the former Long-Leche-Maestri machines are attempting to destroy the reforms created by Governor Sam H. Jones; and,
 

 “ ‘Whereas, five members of the supreme court of the state of Louisiana have seen fit to aid and abet in the accomplishment of this result through the means of declaring constitutional amendments unconstitutional on technical grounds:
 

 “ ‘Be it resolved, that the members of the Seventh Ward Independent Democratic Organization tender our support to Govern- or Jones and declare that we do not intend
 
 *166
 
 to stand for dictatorship by the court any more than we stood for dictatorship in the executive department under the iast administration.”
 

 The Walter Maignan referred to in the article is one of the respondents in the rules for contempt.
 

 We do not think it can be successfully contended that the speeches of the followers of a political faction and the resolutions adopted at the ward meetings of their faction of the character of those which we have reproduced from the newspapers did nothing more than criticise the conclusions reached by a majority of this Court in invalidating the reorganization amendment, on the ground that it violated well-recognized constitutional requirements. In our opinion, the speeches and resolutions were intended and were calculated to arouse public opinion against the five members of this Court who participated in the decision and to produce the impression upon their minds that if they persisted in their decision, they would be subject to such public odium and hatred as would restrain them from doing so. The fact that the five members of this Court who were referred to in the speeches and resolutions were not influenced thereby is of no importance. Under the jurisprudence prevailing before the decision of the Supreme Court of the United States in the Bridges and the Times-Mirror Company case, it was not the influence upon the mind of a particular judge that was the test to be applied to the alleged contemnor’s act, but whether his act had a reasonable tendency to influence or bring about a pernicious result.
 

 Three of the respondents, Charles Payne Fenner, C. L. Merritt and Albert J. Wolf, were among the signers of the letter, addressed to the Governor by the Citizens’ Voluntary Committee, which was made public in all the daily newspapers published in the City of New Orleans. As reproduced in the Times-Picayune of July 13, 1941, under the heading “Help to Restore Reforms Pledged by Citizens’ Unit,” the letter reads as follows:
 

 “We have followed with interest decisions of our courts which operate to defeat the purpose of government reforms embodied in the reorganization act and other vital legislation and it is of course a source of sincere regret that your efforts should be brought to naught because of relatively minor legal defects.
 

 “Despite decisions ' of the courts, there can be no question raised as to the good intentions and integrity of the present state administration and we are confident that plans presently being considered will operate to Correct the flaws which our courts have pointed out to the end that the people of our state might not be deprived of the high type of government which your administration has striven so hard to provide.
 

 “It is difficult to understand how any court — and more especially only five members of a court — could see its way clear to nullify legislation which had been approved and passed almost unanimously by the Legislature and then subsequently ratified by a
 
 *168
 
 large majority of the state electorate. It is equally difficult to understand how any well-meaning individual or group in considering the welfare of our state could have objected to the laws which have been invalidated solely because of legal technicalities.
 

 “We know that you have had a strenuous task since the date of your inauguration and that your sole purpose has been to bring about reforms so necessary to the welfare of our state.
 

 “As members of the Citizens’ Voluntary Committee of Louisiana, we want to help you to continue that work and we stand ready and willing to enlist the active support of every member of our organization at such time and in such manner as you may deem advisable.”
 

 Considered from any standpoint, the expressions contained in the letter could not be, nor were they intended to be, helpful to the Court in reaching a correct conclusion in the pending litigation. Although it may be doubtful whether even under the application of the reasonable tendency rule, respondents, in signing and publishing the letter, committed acts falling directly within the definition of punishable contempt, nevertheless, there can be no doubt that their acts were highly improper and constituted a gross discourtesy to the members of this Court.
 

 In the Bridges and the Times-Mirror Company case, the Supreme Court of the United States held that clear and present danger of substantive evils as the result of indiscriminate publications regarding judicial proceedings justifies an impairment of the constitutional right of freedom of speech and press only if the evils are extremely serious and the degree of imminence extremely high. As pointed out in the opinion, at page 197 of 62 S.Ct., at page of 86 L.Ed., the substantive evil sought to be averted by the courts of California in upholding contempt proceedings against Bridges and the Times-Mirror Company was the inherent tendency of their acts to embarrass and influence the decisions of the judge before whom the suits were pending. The Supreme Court of the United States, in discussing the proposition, stated:
 

 “The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice.
 

 “The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one’s mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
 

 “The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word ‘trial’ connotes decisions on the evidence and arguments properly advanced in open court. Legal
 
 *170
 
 trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases.”
 

 Since neither the condition produced in the popular mind by respondents’ statements or publications could ór did deter the members of this Court from performing their sworn duty, nor could or did bring about a disorderly and unfair administration of justice, we are constrained to hold that the rules for contempt herein taken against respondents must be discharged.
 

 Before entering our formal decree, however, we deem it proper to remind the respondents who are members of the Bar that they are officers of this Court and are amenable to its disciplinary powers. The Canons of Ethics governing their professional conduct prescribe their duties to the courts. The canons are embodied in the Articles of Incorporation of the Louisiana State Bar Association of which all the respondent lawyers are members.
 

 Section 1 of Article 14 of the Articles of Incorporation declares that:
 

 “It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. * * * ”
 

 Section 20 of Article 14 of the Articles of Incorporation provides:
 

 “Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. * * * ”
 

 For the reasons assigned, the rules for contempt herein issued against the Times-Picayune, Times-Picayune Publishing Company, Inc., Leonard K. Nicholson, President of the Times-Picayune Publishing Company, Inc., George W. Healy, Jr., Editor of the Times-Picayune Publishing Company, Inc., New Orleans States, Leonard K. Nicholson, Publisher of the New Orleans States, James E. Crown, Editor of the New Orleans States, the New Orleans Item, the Item Company, Inc., Marshall Ballard, Editor of the New Orleans Item, Lionel G. Ott, Campbell Palfrey, Richard Montgomery, Jr., David A. Casey, Joseph F. Deynoodt, Walter Maignan, C. L. Merritt, Albert J. Wolf, and Charles Payne Fenner, Jr., are discharged.