## KIRKHAM v. SWEETRING, Judge.

No. 6787.   Decided July 6, 1945.   (160 P. 2d 435.)

See 17 C. J. S., Contempt, sec. 30; 12 Am. Jur., 415.

*Grant Macfarlane, Critchlow & Critchlow, Calvin W. Rawlings* and *Parnell Black,* all of Salt Lake City, for plaintiff.

*Hammond & Hammond, Frank B. Hanson,* and *B. L. Dart,* all of Price, for defendant.

WOLFE, Justice.

Original proceeding upon a petition for a writ of prohibition to prohibit the defendant as City Judge of the City Court of Price, Utah, from proceeding further to hear or decide a charge of contempt of court or punish the plaintiff therefor. The application for the alternative writ was heard ex parte. The writ issued ordering the defendant to show cause on or before a day certain why the writ should not be made permanent.

The pleadings show that the petitioner was served with a warrant of attachment on October 30, 1944. The warrant was issued by the defendant, S. J. Sweetring, Judge of the City Court of Price, requiring the petitioner to answer a charge of contempt of court. The warrant of attachment issued upon the presentation of an affidavit of one Carlyle Pace, deputy clerk of the City Court of Price. After the alternative writ issued and was served on the defendant, a supplemental affidavit was filed. The affidavits reveal that the alleged contempt arises out of the fact that the petitioner published a certain pamphlet entitled "Morals and the Mayor" in which reference was made to the functioning of the City Court. The affiant concluded that the pamphlet

"reflects on the integrity of the said Judge and Court, it defames said Judge and said Court; it is a personal and scurrilous abuse of said Judge as a Judge; and constitutes a contempt of said City Court of Price."

The supplemental affidavit incorporated by reference a copy of the pamphlet.

Both the affidavit and supplemental affidavit affirmatively show that the contempt proceeding is bottomed solely upon the publication of the pamphlet, "Morals and the Mayor." The pamphlet is too lengthy to reproduce here in full and much of it is unrelated to the subject under discussion. The following are the only statements which either directly or indirectly refer to the City Court:

In referring to the various sources of revenue for the City of Price the pamphlet says:

"It is claimed that the fines and forfeitures collected are only $5093.37 more than the cost of maintaining the city court. That statement obscures the issue, because that court has to be maintained anyway. The income from the city court, as shown by the city statements, amounts annually to $13,741.89. * * *"

After referring to two other sources of revenue, the pamphlet states:

"Revenue from the Underworld

"But more important than allowing corporations to escape just taxes is the planned support of city government by permitting vice and collecting money for it from the underworld. Fines have a legitimate place in restraining crime, but permitting it by collecting periodical fines or forfeitures violates the statutes, is anti-social and is palpably immoral. This system is and has been the policy of city government of Price. It is the policy of Mayor J. Bracken Lee. If he has agreed verbally with his city marshal, city judge and/or other city officials to carry it out, it is overt conspiracy; if it results only from general agreement between them and the underworld it is tacit conspiracy, and conspiracy to break the law and promote crime is itself a criminal offense."

On page 6 of the pamphlet the petitioner says:

"The question may arise after reading these ugly facts, why the State does not intervene. It is difficult, as public officers know, to enforce state law within a municipality when the local officers are only indifferent. It is much harder when there is open resistance by them. The latter situation has existed at Price."

On page 7, after describing a so-called "John Doe" receipt for bail signed by the Chief of Police, the pamphlet contains the following:

"This 'John Doe' receipt is the commonly used method of collecting what is of course a virtual license for gambling. It is periodical and frequently covers in the record a number of offenders. In Volume 1 of the Register of Criminal Actions, Price City there are recorded numerous cases of forfeitures. For example:

"Case No. 335. John Doe and Richard Roe forfeited $70.00 on March 29, 1943, for operating a gambling device.

"Then follows extracts of similar entries of forfeitures by John Doe and Richard Roe for operating gambling devices."

Since the defendant judge is the only judge of the City Court of Price, the above statements refer indirectly to him as judge to the same extent that they refer to the Court as such.

From the above quotations it appears that all of the statements made relate to past conduct of the judge and court. They in no way tend to nor advise a disregard of any lawful order of the court. Nor do they tend to interrupt the due course of a trial or attempt to influence the result of a pending case. They were made out of the view and presence of the court and judge. If the court can punish this petitioner for contempt solely upon the grounds that he published this pamphlet, it is difficult to see why the court could not punish for contempt any person who sought in any manner to criticize the court or judge. The result of such a doctrine is, as noted by *State ex rel. Attorney General* v. *Circuit Court,* 97 Wis. 1, 72 N. W. 193, 196, 38 L. R. A. 554, 65 Am. St. Rep. 90, such that

"all unfavorable criticism of a sitting judge's past official action can be at once stopped by the judge himself, or, if not stopped, can be punished by immediate imprisonment. If there can be any more effectual way to gag the press, and subvert freedom of speech, we do not know where to find it."

There can be no doubt that at the early common law any comment upon the court's action in either concluded or pending cases, where libelous or calculated to bring the court into disrepute, was freely punishable as contempt. See the excellent collection of authorities in 68 L. R. A. 251. It is there stated:

"The whole theory of the early common law of contempt is admirably delivered by Wilmot, J., in *King* v. *Almon,* Wilmot's Notes, page 253, a case which was never actually decided by reason of its abatement in consequence of the death of the defendant before judgment. The publication there complained of was a volume containing a diatribe

against Lord Mansfield for allowing an amendment of pleading as of course, and apparently from corrupt motives, in a concluded case, and further charging him with having introduced a practice to defeat the efficacy of the writ of habeas corpus. It is there said: 'The arraignment of the justice of the judges is arraigning the King's justice; it is an impeachment of his wisdom and goodness in the choice of his judges, and excites in the mind of the people a general dissatisfaction with all judicial determinations, and indisposes their minds to obey them; and whenever men's allegiance to the laws is so fundamentally shaken, it is the most fatal and most dangerous obstruction of justice, and, in my opinion, calls out for a more rapid and immediate redress than any other obstruction whatever,—not for the sake of the judges as private individuals, but because they are the channels by which the King's justice is conveyed to the people. To be impartial, and to be universally thought so, are both absolutely necessary for the giving justice that free, open and uninterrupted current which it has for many ages found all over this Kingdom, and which so eminently distinguishes and exalts it above all nations upon the earth  *  *  *. The constitution has provided very apt and proper remedies for correcting and rectifying the involuntary mistakes of judges, and for punishing and removing them for any voluntary perversions of justice. But, if their authority is to be trampled upon by pamphleteers and newswriters and the people are to be told that the power given to the judges for their protection is prostituted to their destruction, the court may retain its power some little time; but I am sure it will instantly lose all its authority, and the power of the court will not long survive the authority of it. Is it possible to stab the authority more fatally than by charging the court, and more particularly the chief justice, with having introduced a rule to subvert the constitutional liberty of the people? A greater scandal could not be published.  *  *  *  It is conceded that an act of violence upon his person when he was making such an order would be a contempt punishable by attachment. Upon what principle? For striking a judge in walking along the streets would not be a contempt of the court. The reason, therefore, must be, that he is in the exercise of his office, and discharging the function of a judge of this court; and, if his person is under this protection, why should not his character be under the same protection? It is not for the sake of the individual, but for the sake of the public, that his person is under such protection; and, in respect of the public, the imputing corruption and the perversion of justice to him, in an order made by him at his chambers, is attended with much more mischievous consequences than a blow; and therefore the reason of proceeding in this summary manner applies with equal, if not superior, force, to one case as well as the other. There is no greater obstruction

to the execution of justice from the striking a judge than from abusing him, because his order lies open to be enforced or discharged, whether the judge is struck or abused for making it.'

"Imputing corruption to the judges, says Wilmot, J., graphically in another paragraph, 'murders their fame, which is the vital part of their authority when they sit here.' "

The above is an excellent summary of the reasons given for the early common law rule. For the later English view see 68 L. R. A. 252; Goodhart, Newspapers and Contempt in English Law, 48 Harvard Law Review 885. Any argument to the effect that this English concept was ■ adopted as a part of our judicial system at the time of the adoption of the Constitution is effectively answered in *Bridges* v. *State of California*, 314 U. S. 252, 62 S. Ct. 190, 194, 86 L. Ed. 192. It is there stated that to assume that the English common law in this field became ours is to

"deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, Freedom of the Press in the United States, 9 Publications Amer. Sociol. Soc., 67, 76."

The weight of authority of the early American cases is clearly to the effect that comment upon concluded cases is unrestricted under our constitutional guaranty of the liberty of the press. See *State* v. *Circuit Court*, supra, 97 Wis. 1, 72 N. W. 193, 38 L. R. A. 554, 65 ■ Am. St. Rep. 90; *Percival* v. *State*, 45 Neb. 741, 64 N. W. 221, 50 Am. St. Rep. 568; *State* v. *Sweetland*, 3 S. D. 503, 54 N. W. 415; *In re Pryor*, 18 Kan. 72, 26 Am. Rep. 747; *Cooper* v. *People*, 13 Colo. 337, 373, 22 P. 790, 6 L. R. A. 430; *State* v. *Kaiser*, 20 Or. 50, 23 P. 964, 8 L. R. A. 584. See generally the comments on the cases in the annotation in 68 L. R. A. 251, 255. Nearly all of the cases involving pamphlet and newspaper publications place considerable emphasis on whether the comment relates to a pending case or to one which has been completed. The basis for the holding that comments relative to the action of the judge

or court on a completed case is not contempt is stated in *State* v. *Sweetland,* as follows [3 S. D. 503, 54 N. W. 417]:

"The object of contempt proceedings is not to enable a judge, who deems himself aggrieved, to punish the supposed wrongdoer to gratify his own personal feelings, but to vindicate the dignity and independence of the court, and to protect himself, and those necessarily connected with it, while a matter is pending before it, from insolent and contemptuous abuse calculated to intimidate, influence, embarrass, or impede the court in the exercise of its judicial functions, or prevent a fair and impartial trial. If the judge was unjustly assailed by the article in question, he had the same, and only the same, remedies for the redress of the wrong which belong to all other citizens. After the conclusion of a trial the right of the press, without fear of punishment by contempt proceedings, in the interest of the public good, to challenge the conduct of the judge, parties, jurors, or witnesses, and to arraign them at the bar of public opinion in connection with causes that have been fully determined, cannot be denied by a court in any other manner than by the ordinary proceedings in courts of justice. It would be a perversion of the salutary doctrines governing the proceedings of courts and its power to punish for contempts, to permit a judge to summon before him and punish by fine and imprisonment one who challenges his learning, integrity, or impartiality as a judge in a public newspaper, except when the interests of the state demand it, to vindicate the independence and integrity of the courts, and to protect them from publications, directly calculated to embarrass, impede, intimidate, or influence them in the due administration of justice in proceedings pending before them."

There have been state decisions to the contrary. For a partial list of cases see Nelles and King, Contempt by Publication in the United States, 28 Col. Law Rev. 401, 525, 554. See also 68 L. R. A. 251, 257.

This question of contempt by publication was recently considered by the United States Supreme Court in *Bridges* v. *State of California,* supra. The prevailing opinion written by Mr. Justice Black and the dissenting opinion written by Mr. Justice Frankfurter contain a rather complete discussion of contempt by publication as related to the constitutional guarantee of freedom of speech and of the press. The case came to the Supreme Court on writs of certiorari

to the Supreme Court of California. The Superior Court of Los Angeles County had adjudged the petitioners guilty of contempt for the newspaper publication of certain comments pertaining to pending litigation. Both in the Superior Court and in the California Supreme Court the petitioners challenged the state's action as an abridgment of freedom of speech and of the press. The Superior Court overruled this contention and the Supreme Court affirmed. By a five-four decision, the United States Supreme Court reversed. The dissenting opinion was in part based upon the concept that the comments held by the California courts to be contemptuous, related to pending cases. Mr. Justice Frankfurter and the other dissenting justices apparently would have taken a different view had the comments related to completed cases, for he stated:

> "It [the comment] must refer to a matter under consideration and constitute in effect a threat to its impartial disposition. It must be calculated to create an atmospheric pressure incompatible with rational, impartial adjudication. But to interfere with justice it need not succeed. As with other offenses, the state should be able to proscribe attempts that fail because of the danger that attempts may succeed. The purpose, it will do not harm to repeat, is not to protect the court as a mystical entity or the judges as individuals or as annointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed. The purpose is to protect immediate litigants and the public from the mischievous danger of an unfree or coerced tribunal. The power should be invoked only where the adjudicatory process may be hampered or hindered in its calm, detached, and fearless discharge of its duty on the basis of what has been submitted in court. The belief that decisions are so reached is the source of the confidence on which law ultimately rests."

And at another point in the dissent, Mr. Justice Frankfurter said:

> "A publication intended to teach the judge a lesson, or to vent spleen, or to discredit him, or to influence him in his future conduct, would not justify exercise of the contempt power. Compare Judge Learned Hand in *Ex parte Craig*, 2 Cir., 282 F. 138, 160, 161."

After noting that the newspaper comments concerned a pending case, the majority opinion said:

"Yet such criticism after final disposition of the proceedings would clearly have been privileged."

Thus both the dissenting and prevailing opinions recognize that comments on completed cases are privileged and that the publisher cannot be punished for contempt of court for publishing them.

The majority went still further. It applied the rule developed in *Schenck* v. *United States,* 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470, that there must be a determination of whether or not

"the words used * * * are of such a nature as to create a clear and present danger that they will bring about the substantive evils."

The substantive evil which might arise from the publication of comments concerning pending cases is that it will interfere with the orderly administration of justice. The majority held that the likelihood, however strong, that a substantive evil will result cannot alone justify a restriction on freedom of speech or of the press, but that the evil itself must be substantial and must be serious, and in addition there must be reasonable grounds for believing that the danger apprehended is imminent. After noting the circumstances under which the newspaper comments were published it concluded that there was not clear and present danger that they would interfere with the orderly administration of justice. It therefore reversed the judgment of the Supreme Court of California and held that the publication of the comments was not punishable as contempt of court. The comments were published after the jury had returned a verdict of guilty but before the judge had passed sentence. They related to the punishment that should be imposed and in strong language advised that the court would make a serious mistake if it granted probation. The Superior Court had found that the comments had an "inherent

tendency" and the Supreme Court of California said a "reasonable tendency" to interfere with the orderly administration of justice. The United States Supreme Court held that "reasonable tendency" or "inherent tendency" is not sufficient; that there must be a clear and present danger of such interference.

In view of the above authorities, there can be no doubt that the publication of the various comments in the pamphlet "Morals and the Mayor" did not constitute contempt of court. This follows even though we take as true the statement in the affidavit that the pamphlet ■ reflects on the integrity of the Judge and Court; that it defames the Judge, and is a personal and scurrilous abuse of the Judge as a Judge, there is no contempt. To assume that respect for courts and judges can be maintained by compulsion is to misjudge human nature. Respect for the courts is and must be a voluntary tribute of the public to worth and intelligence. The qualified man lends dignity to the bench. As noted by the United States Supreme Court in *Bridges* v. *State of California*, supra:

"The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." See also *Stuart* v. *People*, 4 Scam., Ill., 395, 402.

The publication of the pamphlet did not constitute criminal contempt. The alternative writ heretofore issued is made permanent.

McDONOUGH, TURNER, and WADE, JJ., concur.

LARSON, Chief Justice (concurring.)

I agree that the matters published in the pamphlet did not constitute criminal contempt. I do not think it con-

stituted any contemptuous action, or in any way cast reflections or aspersions on the court. It seems clear to me that the statements cited were directed at the mayor and his policies, and were not intended as references to the court or the conduct of its business. I therefore concur.