EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PABLO VARGAS BADILLO, acusado y apelante.

Núm. 11664.—*Sometido:* Marzo 12, 1947. *Resuelto:* Abril 1, 1947.

*R. Rivera Zayas* y *G. Rivera Cestero,* abogados del apelante; *Hon. Procurador General Interino Luis Negrón Fernández,* y *J. Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado; *Miguel Guerra-Mondragón,* abogado de la Unión Americana de Libertades Civiles, y *Benjamín* y *Alvaro Ortiz,* abogados de la Sociedad de Periodistas de Puerto Rico, como *amici curiae.*

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

En septiembre 10 de 1946 el Juez Arcilio Alvarado, del Tribunal de Distrito de San Juan, decretó el arresto de Pablo Vargas Badillo, Director del periódico ''El Mundo'', y

señaló el 17 del mismo mes para que el acusado compareciese a mostrar causas por las cuales no debiera ser condenado por desacato. No conforme con las razones aducidas por el acusado, el mismo Juez Alvarado le declaró culpable de un desacato criminal y le condenó a pagar un dólar de multa o a sufrir un día de cárcel. El acusado interpuso el presente recurso. Los hechos que motivaron este proceso son como sigue:

El fiscal formuló ante la Corte Municipal de San Juan dos acusaciones contra el comerciante Basilio Carrasquillo y su dependiente Alberto Carrasquillo, la primera por haber vendido una libra de arroz en diez centavos, cuando el precio legal era el de nueve centavos, y la segunda por haber vendido una lata de salsa de tomate en once centavos, cuando el precio legal era el de ocho centavos. La Corte Municipal declaró culpables a ambos acusados y condenó a Basilio Carrasquillo, alegado dueño del establecimiento, a pagar una multa de cien dólares y a sufrir tres meses de cárcel y a Alberto Carrasquillo, el dependiente que hizo las ventas, a setenta y cinco dólares de multa, en cada caso. Vistos ambos casos en apelación ante el Tribunal de Distrito, presidido por el Juez Alvarado, éste declaró con lugar la moción de la defensa para la absolución perentoria de Basilio Carrasquillo y absolvió a dicho acusado.

En la edición de "El Mundo" correspondiente al 7 de septiembre de 1946, apareció la siguiente noticia de redacción:

"ABSUELTO AYER UN COMERCIANTE EN LA CAPITAL.—Había sido condenado por Corte Municipal.—Detalles del caso.—El Juez Arcilio Alvarado, del Tribunal del Distrito, absolvió ayer libremente al comerciante Basilio Carrasquillo Quiñones, a quien se le imputaron dos violaciones a la ley de precios.—El fiscal auxiliar Domingo Candelario había acusado a Carrasquillo Quiñones conjuntamente con Alberto Carrasquillo de haber vendido una libra de arroz en diez centavos, cuando su precio legal es de nueve, y una lata de salsa de tomate en once centavos, cuando su precio legal es de ocho centavos. Vistos los dos casos en la Corte Municipal de San Juan, ante el Juez

Victoriano Fernández, éste condenó a los dos acusados, a Basilio Carrasquillo Quiñones a pagar cien dólares de multa y cumplir tres meses de cárcel y a Alberto Carrasquillo a pagar setenta y cinco dólares de multa en cada caso. El Ledo. Gustavo Marrero Ledesma apeló los dos casos del primero, ·Basilio Carrasquillo Quiñones, para el Tribunal del Distrito. Oída la prueba en los casos, el juez Alvarado declaró inocente al comerciante acusado 'porque tenía dudas sobre si en realidad éste era el dueño del negocio donde se alega se hicieron estas compras y porque tampoco estaba seguro de si en el momento de dichas compras él estaba allí presente.' ''

En la edición del mismo periódico correspondiente al 10 de septiembre de 1946, apareció un editorial titulado ''Un Precedente Peligroso'', en el cual se comenta el caso del comerciante Carrasquillo y se hace constar por segunda vez que el Juez Alvarado lo absolvió basándose en que ''tenía dudas sobre si en realidad éste era el dueño del negocio donde se alega se hicieron estas compras y porque tampoco está seguro de si, en el momento de dichas compras, él estaba allí presente.'' Continúa el editorial diciendo, en síntesis, que la decisión del Juez Alvarado crea el precedente de que ''para ser convicto de agiotismo, al dueño de un negocio debe probársele que él estaba presente al hacerse la transacción''; que si ese criterio perdurase, el control de precios se haría muy difícil; que la referida sentencia deja un salidero por el cual los agiotistas podrían maniobrar libremente; y que existe jurisprudencia de nuestro Tribunal Supremo que a juicio del editorialista impide las absoluciones por el motivo de ausencia del establecimiento. Después de citar párrafos de la opinión emitida por este Tribunal, por voz del Juez Asociado Sr. Snyder, en el caso de *El Pueblo* v. *Díaz Rivera,* 62 D.P.R. 136, continúa el editorial invitando al Juez Alvarado a revisar dicha opinión, y termina con estas palabras:

''Constándonos, como nos consta, el empeño con que el Juez Alvarado pone en vigor la ley de precios, es indudable que él ha de ver clara nuestra intención de ayudar, humildemente, a impedir que surjan salideros por los cuales puedan escaparse los que especulan

con la necesidad pública. Está muy lejos de nuestra intención establecer pautas legales; pero nuestro buen deseo de contribuir a acabar con el mercado negro nos anima a hacer estas consideraciones que esperamos sean vistas con la misma voluntad.''

Irritado, sin duda alguna, por el editorial más que por la noticia de redacción publicada tres días antes, el Juez Alvarado procedió sumariamente contra el Director de ''El Mundo'', haciendo constar en la orden expedida el mismo día 10 de septiembre de 1946 que ''la información de 'El Mundo' de fecha 7 de septiembre de 1946 en lo relativo a los fundamentos que tuvo la corte para absolver al acusado Basilio Carrasquillo Quiñones son falsos y constituyen una información falsa respecto a un procedimiento judicial, lo cual tiende a desmerecer el prestigio del Tribunal, minando así la administración de justicia, y en los comentarios editoriales publicados en el mismo periódico de fecha 10 de septiembre de 1946, basados en dicha información falsa, se hace aparecer al tribunal como contraviniendo jurisprudencia del Tribunal Supremo de Puerto Rico y creando salideros para los agiotistas librarse de responsabilidad criminal.'' Considerando que el contenido de ambas publicaciones era constitutivo, prima facie, de un desacato al Tribunal por él presidido, el Juez Alvarado decretó el arresto del director del periódico ofensor.

En el acto de la vista celebrada ante este Tribunal informaron oralmente, además del abogado del apelante, los representantes de la Unión Americana de Libertades Civiles y de la Sociedad de Periodistas de Puerto Rico, como *amici curiae*. En extensos y luminosos alegatos, los distinguidos representantes del acusado y de las mencionadas entidades, levantan numerosas cuestiones legales, muchas de las cuales no hemos de discutir por considerarlo innecesario para la decisión del caso.

Procederemos primero a examinar la Ley bajo la cual se instituyó este proceso por desacato.

██ La Ley de 1 de marzo de 1902, "Definiendo el Delito de Desacato y disponiendo la Pena correspondiente", enmendada por la Ley de 8 de marzo de 1906 e incorporada al Código Penal vigente, artículo 145, dispone en su sección 1 que las cortes de distrito tendrán facultad para castigar por desacato a toda persona culpable, entre otros, de los actos siguientes:

"5. *Publicación Inexacta.* La voluntaria publicación de cualquier informe falso o groseramente inexacto, de procedimientos judiciales; *Disponiéndose, sin embargo,* que la publicación de cualquier informe verdadero y justo de algún procedimiento judicial, no será penable como desacato." (Bastardillas nuestras.)

La querella formulada por el Juez Alvarado contra el apelante, se basa, según ya hemos visto, en que "la información de 'El Mundo' de fecha 7 de septiembre de 1946 en lo relativo a los fundamentos que tuvo la corte para absolver al acusado Basilio Carrasquillo Quiñones *son falsos* y constituyen una *información falsa respecto a un procedimiento judicial,* etc." Prescindiremos por ahora de las alegaciones de la querella referentes al editorial del 10 de septiembre, toda vez que el juez sentenciador hizo constar, antes de que se practicase la prueba, que el proceso no se continuaría en forma alguna en cuanto a lo expuesto en dicho editorial, "pero sí se continuará este proceso por la información contenida en la edición de septiembre 7, en tanto en cuanto se imputa a dicha información ser falsa."

Asumiendo, sin resolverlo, que la noticia publicada el 7 de septiembre pueda y deba ser considerada como "la voluntaria publicación de un informe falso o groseramente inexacto" del procedimiento seguido contra Basilio Carrasquillo Quiñones, la primera cuestión que debemos considerar y resolver es: ¿Está facultada la corte de distrito para castigar como desacato la publicación de un informe falso o inexacto de un procedimiento judicial que ya había terminado por una sentencia absolutoria contra la cual no cabía interponer recurso alguno? Examinemos la jurisprudencia.

El caso de *People of Virgin Islands* v. *Brodhurst*, 148 F.2d 636, decidido por la Corte de Circuito de Apelaciones del Tercer Circuito, envolvía una situación idéntica a la del presente caso. Ante la Corte de Distrito de las Islas Vírgenes, sin la intervención de un jurado, se celebró la vista del caso por asesinato contra un individuo de la raza blanca acusado de haber dado muerte a otro de la raza negra. El acusado fué absuelto por el Juez Moore, perteneciente a la raza de color. Cuatro o cinco días después de dictada la sentencia absolutoria, el periódico *"The St. Croix Avis"* publicó un artículo editorial en el que se comentaba en los términos más violentos e insultantes el procedimiento judicial seguido ante la corte de distrito y que había terminado con la absolución del acusado. Para que podamos darnos cuenta de la naturaleza de lo escrito, copiaremos estos cortos párrafos:

"Cuando el pueblo salió de la sala de la Corte el miércoles pasado después de haber oído la decisión del caso de Harry Beatty por el Juez Moore, hubo gritos de protesta e indignación. '¿Qué es lo que nos queda?' decían. 'Aun la justicia está contra nosotros.' 'Nosotros somos las masas de esta isla, pero somos pisoteados por los talones de los Hitleristas y el soborno y la injusticia vencen a la razón.' . . .

" 'Aquí en St. Croix la consigna es Justicia contra Pobreza.' "

Basándose en las disposiciones del Código de St. Croix, las cuales son idénticas a las del nuestro, el Juez Moore procedió sumariamente contra Brodhurst, editor del periódico, por un delito de desacato y le condenó a la pena de diez días, de cárcel.

Después de decidir que el estatuto de St. Croix autoriza el castigo sumario, tanto por el desacato cometido en la inmediata presencia de la corte como por el cometido fuera de su presencia, la corte de Circuito procedió a considerar y resolver la cuestión fundamental levantada por el apelante, o sea, si el Código de St. Croix es, en tanto en cuanto autoriza ese castigo sumario, inconsistente con la libertad de

palabra y de prensa garantizada por el Acta Orgánica contra las restricciones que pudieran ser impuestas por legislación insular.

El Código de St. Croix empezó a regir el 1 de agosto de 1920. El Acta Orgánica, vigente desde el 22 de junio de 1936 dispone por su Sección 18 que "las leyes de los Estados Unidos aplicables a las Islas Vírgenes en la fecha de la aprobación de esta Ley, y todas las leyes y ordenanzas locales en vigor en dicha fecha en las Islas Vírgenes, no inconsistentes con esta Ley, continuarán teniendo vigor y efecto". La Sección 34 de la Ley Orgánica de Islas Vírgenes, contentiva de la Declaración de Derechos de los habitantes de dichas Islas, dispone que "No se aprobará ninguna ley restringiendo la libertad de la palabra o de la prensa . . . ."

Al revocar la sentencia recurrida, la Corte de Circuito se expresó así:

"Por la sentencia que acabamos de citar, la Ley Orgánica garantiza a los habitantes de las islas, en el mismo lenguaje de la Enmienda Primera a la Constitución de los Estados Unidos, igual libertad de palabra y de la prensa que la garantizada a los habitantes de los Estados Unidos por las Enmiendas Primera y Décimocuarta. La interpretación que se ha dado a esas enmiendas es, por lo tanto, determinativa en cuanto a la interpretación y efecto del lenguaje de la Ley Orgánica.

"La facultad extraordinaria de una corte para imponer un castigo sumario por desacatos criminales de su autoridad está basada en la necesidad de actuar rápida y adecuadamente en contra de una conducta que obstruya el procedimiento de la corte y le impida desempeñar sus funciones judiciales. Fué por razón de la importancia de colocar a la rama judicial del gobierno en condiciones para poder desempeñar sin impedimentos sus altas funciones constitucionales, que las salvaguardias ordinariamente aplicadas en casos criminales no son exigidas en esta situación. (Citas.) Aun cuando va dirigida primariamente hacia conducta obstructiva en la presencia del juez, la facultad se extendió muy pronto para incluir desacatos constructivos cometidos fuera de la presencia de la Corte, *pero que tuvieron, sin embargo, el efecto de obstruir sus procedimientos o de menoscabar su autoridad.*

"* * * * * * *

"El uso de la facultad de castigar por desacato en caso de publicaciones que solamente contienen una crítica difamatoria de la corte o del juez ha sido muy criticado en Inglaterra. En este país está en abierto conflicto con la garantía constitucional del derecho de hablar y escribir libremente para criticar la conducta de los funcionarios públicos, lo mismo los jueces que los otros. Porque esas garantías no son sino una expresión de la creencia de los fundadores de nuestra nación de que la conservación de la libertad para criticar los actos de los funcionarios públicos es esencial para mantener el control democrático sobre los procedimientos del gobierno." (Bastardillas nuestras.)   (Pág. 643.)

La Corte de Circuito llegó a la conclusión de que las disposiciones del Código de St. Croix (Título IV, Cap. 4, Sección 35–3) bajo las cuales se instituyó el procedimiento contra Brodhurst y en las que se definen como desacatos criminales solamente aquellas publicaciones que son difamatorias y tienden a desacreditar injustamente al tribunal o alguno de sus miembros, no sobrevivieron después de la introducción a las Islas Vírgenes, a través de la Sección 34 de la Ley Orgánica, de las garantías constitucionales de libertad de palabra y prensa libre y quedaron derogadas por virtud de la Sección 18 de la misma Ley Orgánica.  La opinión que estamos comentando termina así:

"Finalmente, debe hacerse constar que la actuación de la corte de distrito no puede ser sostenida bajo la teoría de que como cuestión de hecho la publicación obstruyó sus procedimientos y quedó sujeta al poder inherente de la corte para castigar por desacato.  La razón es que el juicio de Beatty, el procedimiento judicial que la publicación criticaba, *había terminado con la absolución de Beatty cinco días antes de que el artículo apareciera y es obvio que el procedimiento no pudo ser obstruído por la publicación.*" (Pág. 644.)   (Bastardillas nuestras.)

La Corte Suprema Federal en fecha reciente (1941), después de un cuidadoso estudio de los antecedentes históricos de la facultad para castigar por desacato y de la limitación de esa facultad por el derecho constitucional de libertad de palabra y de la prensa, estableció la regla que a nuestro

juicio es aplicable para la decisión del caso que estamos considerando. En el caso de *Bridges* v. *California*, 314 U. S. 252, 86 L. Ed. 192, los periodistas apelantes fueron condenados a pagar una multa por un alegado desacato consistente en haber publicado ciertos comentarios sobre un litigio aún pendiente ante la Corte Superior de Los Angeles. La corte sentenciadora basó su sentencia en el alegado poder inherente de las cortes de justicia para castigar como desacato "publicaciones hechas fuera de la sala de la Corte, si las mismas tienden a obstruir la imparcial y ordenada administración de justicia en un caso pendiente." Se alegó en apoyo de la sentencia recurrida, que aun cuando el castigo impuesto "constituye una restricción de la libertad de expresión, el interés público en esa libertad fué correctamente subordinado al interés público en la imparcialidad y dignidad de los tribunales."

La cuestión sometida a la decisión de la Corte Suprema no era una cuestión baladí. Siendo la libertad de expresión y la imparcialidad de los juicios dos de las más preciadas conquistas del derecho humano, no era tarea fácil la de decidir cuál de las dos debía prevalecer y cuál debía ser subordinada a la otra. Las sentencias condenatorias fueron revocadas, expresándose el tribunal así:

"Esta no es, sin embargo, solamente una controversia entre un estado y la nación, como lo sería si se nos llamase para intervenir en una de esas complicadas situaciones en las que cada uno alega ser el depositario de un determinado poder soberano. Es cierto que la facultad aquí en controversia fué ejercitada por el juez de un estado. Pero al decidir si el abarcador mandato constitucional contra cualquier ley 'restringiendo la libertad de palabra o de la prensa', lo prohibe o no, estamos necesariamente midiendo una facultad de todas las cortes americanas, las estatales y las federales, incluyendo esta Corte. (Pág. 260.)

"\* \* \* \* \* \* \*

"Nos damos cuenta de que mientras algunos estados, por estatuto o por decisión judicial, han repudiado expresamente la facultad de los jueces para castigar como desacato ciertas publicaciones, basán-

dose en la mera tendencia de las mismas a obstruir la ordenada administración de la justicia en un caso pendiente, otros estados han autorizado el ejercicio de tal facultad. (Citas.) Pero la facultad de los estados en este campo no ha sido puesta a prueba ante esta Corte desde hace más de un siglo. No fué hasta el 1925, en el caso de *Gitlow* v. *New York*, supra, 268 U.S. 652, que esta Corte reconoció en la Enmienda Catorce la aplicación a los estados de las mismas normas de libertad de expresión que de acuerdo con la Enmienda Primera son aplicables al gobierno federal. Y ésta es la primera vez desde 1925 que se nos ha llamado para determinar la constitucionalidad del ejercicio por un estado de la facultad para castigar por desacato en una situación como la presente. Ahora que tenemos ese caso ante nosotros, no podemos permitir que la mera existencia de otras decisiones estatales no sometidas a prueba sirva para destruir el significado constitucional histórico de la libertad de palabra y de la prensa." (Págs. 267-8.)

El editorial publicado en *The Los Angeles Times*, después de un vigoroso ataque contra dos miembros de una unión obrera, convictos de haber agredido a obreros no unionados, terminaba diciendo: "El Juez A. A. Scott cometerá una seria equivocación si concede la libertad bajo palabra a S. y a H. Esta comunidad necesita el ejemplo de su asignación al molino de yute." El editorial fué publicado alrededor de un mes antes de la fecha señalada por el Juez Scott para resolver la solicitud para una sentencia probatoria. La publicación fué castigada como desacato, según la corte sentenciadora por su "tendencia inherente", y de acuerdo con la Corte Suprema de California por su "tendencia razonable", a intervenir en la ordenada administración de justicia en una acción pendiente de consideración ante una corte. Después de exponer y discutir los hechos, la Corte Suprema Federal continuó diciendo:

"Por estas razones estamos convencidos de que las sentencias recurridas constituyen una restricción de la libertad de expresión, que no pueda ser considerada como insignificante. Si pueden ser justificadas en alguna forma, deberá ser en términos de algún mal substantivo y serio que ellas tratan de evitar. El mal substantivo que aquí se ha tratado de evitar ha sido descrito de varias maneras

en la corte inferior. Parece ser doble: falta de respeto a la judicatura; y desordenada e injusta administración de justicia. La asunción de que el respeto a la judicatura puede ganarse escudando a los jueces en contra de la crítica pública, es una apreciación errónea del carácter de la opinión pública americana. Porque es un privilegio americano muy apreciado el de poder uno expresar su pensamiento, aunque no sea siempre con perfecto buen gusto, en cuanto a todas las instituciones públicas. Y un silencio forzado, aun cuando sea limitado, solamente a nombre de la protección de la dignidad de la corte, probablemente engendraría resentimiento, sospecha, y desprecio, mucho mayor que el respeto que pudiera producir.

"El otro mal temido, la desordenada e injusta administración de la justicia, está más plausiblemente asociado con la restricción de publicaciones que afecten a litigios pendientes. La misma palabra 'juicio' (*trial*) connota decisiones en cuanto a la evidencia y argumentos debidamente presentados en corte abierta. Los juicios legales no son como las elecciones, para ser ganados por medio de mítines, por la radio o en los periódicos. Pero no podemos comenzar asumiendo que publicaciones como las envueltas en este caso realmente amenazan cambiar la naturaleza de los juicios legales, y que para preservar la imparcialidad judicial es necesario que los jueces tengan la facultad de castigar por desacato para poder así cerrar todos los canales de pública expresión en todo aquello que esté relacionado con casos pendientes." (Págs. 270-71.)

Una minoría, los Jueces Frankfurter, Stone, Roberts y Byrnes, opinaron que las publicaciones eran y debían ser castigadas como un desacato al tribunal inferior. De la opinión disidente, escrita por el Juez Frankfurter copiamos lo siguiente:

"El comentario, no importa lo franco que sea, es una cosa. La intimidación con respecto a cuestiones específicas *todavía pendientes judicialmente,* es otra cosa. . . . Una publicación que tiende a darle una lección al Juez, . . . o a desacreditarle, o a influir en su conducta en el futuro, no justificaría el ejercicio de la facultad para castigar por desacato. . . . *Debe referirse a una cuestión bajo consideración y constituir una amenaza para una decisión imparcial.* Para obstruir la justicia no es necesario que la publicación tenga éxito. Como en el caso de otras ofensas, el estado debe tener el poder de proscribir las tentativas que fracasan, para evitar el peligro de las

tentativas que puedan tener éxito. El propósito, no causará daño el repetirlo, no es el proteger a la corte como una entidad mística o a los jueces como individuos o como sacerdotes consagrados, separados de la comunidad y libres de la crítica a la cual en una democracia todos los demás servidores públicos están expuestos. El propósito es proteger a los litigantes y al público contra el pernicioso peligro de un tribunal que no sea libre o esté coaccionado. La facultad debe ser invocada solamente cuando el proceso adjudicatorio pueda ser impedido u obstaculizado en el cumplimiento de su deber, tranquila y desinteresadamente y libre de temor, sobre la base de lo que ha sido sometido en corte. La creencia de que las desiciones son dictadas así, es la fuente de la confianza sobre la cual en definitiva descansa la justicia." (Págs. 291–2.)

La opinión de la Corte Suprema es unánime en cuanto a que las cortes están facultadas, bien sea de acuerdo con la doctrina del poder inherente o por disposición Legislativa, para castigar como desacato la publicación de cualquier informe que tienda a intimidar, a obstaculizar o a influir sobre las cortes en la debida administración de justicia en asuntos pendientes. También fué unánime la opinión en cuanto a que las cortes carecen de esa facultad cuando la publicación, no importa cuán falsa o libelosa pueda ser, se refiere a un procedimiento judicial ya terminado. La diferencia de opinión surgió en cuanto a si la publicación de *The Los Angeles Times,* referente a un asunto pendiente de decisión, tendía a influir en o a obstaculizar la administración de justicia.

En *Pennekamp et al.* v. *Florida,* 328 U. S. 331, el editor del Miami Herald solicitó la revisión de la sentencia por desacato que le fuera impuesta por la Corte de Circuito de Florida y que fué confirmada por la Corte Suprema del estado. En dos editoriales y en una caricatura publicados en dicho periódico se hacía una crítica muy severa de ciertas decisiones previamente dictadas por la corte inferior, por considerarlas demasiado favorables a los criminales y a las casas de juego. Dos de los casos en cuestión habían sido sobreseídos. En el tercero, que era un caso de violación, la acusación había sido desestimada por defectos téc-

nicos, pero se había presentado una nueva acusación y el caso estaba aún pendiente. En la citación por desacato se alegaba que las publicaciones se reflejaban sobre e impugnaban la integridad de la corte, tendían a crear una falta de confianza en la corte, voluntariamente suprimían y ocultaban la verdad, y tendían a obstruir la justa e imparcial adjudicación en casos pendientes.

La sentencia de la Corte Suprema.de Florida fué revocada por el voto unánime de la Corte Suprema Federal. De la opinión del Tribunal, emitida por el Juez Reed, copiamos lo que sigue:

"*Bridges* v. *California* fija límites razonablemete bien marcados a la facultad de las cortes para castigar a los periódicos y a otros por comentarios o críticas sobre litigios pendientes. El caso ha colocado el ordenado funcionamiento de las cortes como el requisito primario y dominante en la administración de justicia. Este esencial derecho de las cortes a estar libres de intimidación y coerción es, según sostuvimos, consonante con un reconocimiento de que la libertad de la prensa debe ser permitida en la mayor amplitud que sea compatible con la supremacía del orden. Un determinante teórico del límite para una discusión abierta fué adoptado de la experiencia con otros ajustes del conflicto entre la libertad de expresión y el mantenimiento del orden. Ese determinante es la regla del peligro claro y presente. La mala consecuencia del comentario debe ser 'extremadamente seria y el grado de inminencia extremadamente alto para que las expresiones puedan ser castigadas.' (Pág. 334.)

"\* \* \* \* \* \* \*

"La Constitución ha conferido a esta Corte la autoridad final para determinar el significado y la aplicación de aquellas palabras de dicho instrumento que requieren interpretación para la decisión de controversias judiciales. Con esa responsabilidad, estamos obligados a examinar por nosotros mismos las manifestaciones en cuestión y las circunstancias bajo las cuales fueron hechas para determinar si ellas envuelven o no una amenaza de peligro claro y presente para la imparcialidad y el buen orden de las cortes o si son de tal naturaleza que están protegidas por los principios de la Enmienda Primera, en la forma adoptada por la Cláusula del Debido Proceso de la Enmienda Catorce. Cuando la corte más alta de un estado ha dictado su decisión sobre una de esas controversias, nosotros damos

la más respetuosa atención a sus razonamientos y conclusiones, pero su autoridad no es final. Si fuera de otro modo, las limitaciones constitucionales de libre expresión en la Nación variarían en cada estado.

"Aun cuando hubo una división de la Corte en el caso de *Bridges,* en cuanto a si algunas de las expresiones públicas en los comentarios editoriales traspasaban los límites de una prensa libre y en cuanto a la fraseología de la regla, hubo el reconocimiento unánime que el poder de California para castigar por desacato estaba limitado por la interpretación de esta Corte en cuanto al alcance de la protección concedida por la Enmienda Primera. (Págs. 335-6.)

"* * * * * * *

"¿Qué es lo que significa un peligro claro y presente para una recta administración de justicia? Ninguna definición podría dar una contestación. Ciertamente, esta crítica de las inclinaciones de los jueces o de sus actuaciones en estos procedimientos en que no interviene un jurado, no podría afectar directamente tal administración. Esta crítica de sus actuaciones no podría afectar su capacidad para decidir las cuestiones pendientes. Aquí solamente hay una crítica de actuaciones judiciales ya realizadas, aun cuando los casos estaban todavía pendientes de otras cuestiones o podrían ser revividos para ser vistos de nuevo. Para esas injurias, cuando las manifestaciones son difamatorias, un juez tiene el mismo remedio de daños y perjuicios que tienen los otros servidores públicos." (Págs. 348-9.)

Examinados los hechos del presente caso, tales y como aparecen de la transcripción de evidencia en el caso contra Carrasquillo, ellos demuestran que el informe publicado el 7 de septiembre no es falso, ni tampoco inexacto hasta el punto de merecer el calificativo de ser *"grossly inexact".* El récord demuestra que si en alguna inexactitud incurrió el redactor de la noticia, ella fué inducida por la falta de claridad o de precisión en la resolución de la moción de *nonsuit.* Veamos lo que aparece del récord. Al terminar la presentación de la prueba de cargo, el abogado del acusado dijo:

*"Nonsuit.*—Creemos que no se ha probado que el Sr. Basilio Carrasquillo sea el dueño, ni se ha probado que él, conjuntamente con el hermano, haya vendido a sobreprecio.

"*Juez:* Con lugar la moción de 'nonsuit'. Entiende la corte que no se ha conectado en forma satisfactoria al acusado."

Si se tiene en cuenta que con anterioridad a la moción de *nonsuit* el fiscal y la defensa discutieron *in extenso* la cuestión legal sobre si el fiscal estaba obligado a probar la intervención personal del dueño del establecimiento en la venta ilegal para justificar su convicción, sin que el juez dictara resolución alguna expresiva de su opinión, preciso es concluir que el periodista redactor de la noticia estuvo justificado al creer y así publicarlo que la absolución de Carrasquillo se había basado en los dos fundamentos de la moción para su absolución perentoria, o sea (*a*) que no se probó que fuera el dueño y (*b*) que tampoco se probó su intervención en la venta ilegal realizada por su empleado. Aun cuando el juez no estaba técnicamente obligado a ser más explícito, en vista del interés público en tales casos en aquella fecha y de las tremendas consecuencias de una decisión en el sentido de que el dueño, no presente en la venta, no es culpable, hubiera sido mejor para el interés público si el juez se hubiese cuidado de ser más explícito en su decisión. De todos modos, al periodista, cuya misión es informar a sus lectores sobre cuestiones de público interés, no se le puede exigir que posea la facultad de adivinar lo que el juez sentenciador tuvo en mente, pero no expresó, al dictar su decisión. Si el juez, al resolver la moción, hubiese dicho: "Con lugar. No se ha probado que el acusado sea el dueño del establecimiento," el error en que incurrió el periodista se hubiera evitado. No fué hasta después de publicado el editorial que el juez sentenciador, en la citación por desacato, reveló por vez primera que la absolución se había basado únicamente en la insuficiencia de la prueba de que el acusado era el dueño del negocio.

Aplicando a los hechos de este caso la regla sentada por la jurisprudencia que hemos comentado, no encontramos en la noticia publicada nada que pueda ser considerado como

un peligro claro e inminente para la recta e imparcial administración de la justicia.

Resolvemos, además, que aun cuando la referida noticia no se ajustase a la verdad y envolviese una crítica injusta del Juez Alvarado, la corte inferior carecía de autoridad para dictar la sentencia recurrida, toda vez que la publicación se hizo cuando ya el procedimiento contra el comerciante Carrasquillo había terminado definitivamente por sentencia absolutoria. Además, la facultad para castigar como desacato la publicación de un informe sobre un procedimiento legal concedida a nuestras cortes por la sección 145 del Código Penal, supra, es nula e inconstitucional en cuanto a procedimientos judiciales ya terminados, por ser incompatible con la Declaración de Derechos, Artículo 2 de la Ley Orgánica de Puerto Rico, que garantiza la libertad de la palabra y de la prensa, y por estar en pugna con la regla sentada por la Corte Suprema Federal en los casos citados en esta opinión.

Esta Corte estará siempre dispuesta a castigar severamente como desacato el abuso de la libertad de expresión, cuando su propósito sea el de intimidar a los jueces o el de obstruir de un modo claro y substancial los procedimientos judiciales en asuntos pendientes ante los tribunales. La libertad de la prensa es esencial para la existencia del sistema de gobierno democrático. La historia nos ha demostrado hasta la saciedad que las dictaduras y la prensa libre no pueden coexistir. Pero la libertad de palabra y de la prensa no es una libertad absoluta, porque "en una democracia ninguna institución, ya sea gubernamental o privada, puede tener poder absoluto;" y "la libertad lleva consigo responsabilidad aun para la prensa; libertad de prensa no es una libertad de responsabilidad por su ejercicio." (Opinión concurrente del Juez Frankfurter en *Pennekamp* v. *Florida,* supra, (págs. 355-6)). Pero para que una publicación pueda ser castigada por desacato, como dice el Juez Rutledge en su opinión concurrente en el caso de *Pennekamp*

(pág. 372) "no basta con que la sensibilidad del juez haya sido afectada o que en alguna forma se le haya hecho objeto de burla. Después de todo debe recordarse que son los jueces los que aplican la ley de desacato, y que el ofensor es el que les criticó."

No creemos necesario entrar a considerar y resolver si las cortes de Puerto Rico tienen la facultad inherente para castigar por desacato o si meramente tienen la que para ese fin les confiere la Ley vigente, pues aun cuando resolviéramos que nuestros tribunales están investidos de facultad inherente, esa facultad nunca podría hacerse extensiva para castigar como desacato la publicación de un informe, por falso o difamatorio que pueda ser, si el mismo se refiere a un procedimiento judicial ya terminado.

La decisión en *Pueblo* v. *Lastra Chárriez*, 50 D.P.R. 118, resuelto en 1936, en cuanto sostiene que tanto por disposición del estatuto como de acuerdo con la doctrina del poder inherente, las cortes pueden castigar como desacato la publicación de cualquier informe falso o claramente inexacto sobre cualquier procedimiento judicial, aun cuando éste haya terminado, está en conflicto con las decisiones de la Corte Suprema Federal en los casos de *Bridges* y *Pennekamp* y debe considerarse como revocada.

*La sentencia recurrida debe ser revocada y absuelto el acusado.*